[No. S057081. Feb. 2, 1998.]

BRENT N. MOSS, Petitioner, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
TAMARA S. ORTIZ, Real Party in Interest.

COUNSEL

Alan C. Oberstein and Margaret J. Spencer, Public Defenders, Floyd Zagorsky, Chief Assistant Public Defender, Cheryl Thompson and Taylor L. Huff, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Grover Trask, District Attorney, James P. Fullmer and Glen O. Brandel, Deputy District Attorneys, and Michael H. Clepper for Real Party in Interest.

Phillip J. Cline, District Attorney (Tulare) and John S. Higgins, Jr., Deputy District Attorney, as Amici Curiae on behalf of Real Party in Interest.

OPINION

**BAXTER, J.**—May a parent whose inability to pay court-ordered child support results from a willful failure to seek and obtain employment be adjudged in contempt of court and punished for violation of the order? Concluding that it was bound by this court's decision a century ago in *Ex parte Todd* (1897) 119 Cal. 57 [50 P. 1071] (*Todd*), which was recognized as binding precedent in *In re Jennings* (1982) 133 Cal.App.3d 373 [184 Cal.Rptr. 53] (*Jennings*), the Court of Appeal reluctantly held that to impose

a contempt sanction in those circumstances is beyond the power of the court. It therefore annulled the judgment of contempt in issue in this proceeding. Although not expressly articulated in *Todd*, which, like *Jennings*, involved spousal support, the apparent basis for the *Todd* result was either an assumption that employment sought under even an indirect threat of imprisonment for violation of the support order constituted involuntary servitude or a belief that imposition of a contempt or criminal sanction for failure to pay support constituted imprisonment for debt.

We conclude that there is no constitutional impediment to imposition of contempt sanctions on a parent for violation of a judicial child support order when the parent's financial inability to comply with the order is the result of the parent's willful failure to seek and accept available employment that is commensurate with his or her skills and ability. We shall therefore disapprove *Todd* insofar as it might be read to apply to child support orders. We also address the burden of proof in these contempt proceedings and conclude that inability to comply with a child support order is an affirmative defense. The alleged contemner must prove inability to comply by a preponderance of the evidence, which was not done here.

We shall affirm the judgment of the Court of Appeal, however. We must do so because, in light of the past understanding of *Todd*, our holding that a willfully unemployed, nonsupporting parent is subject to contempt sanctions if the parent fails to comply with a child support order might be deemed an unanticipated change in the law, and Tamara Ortiz, the custodial parent, did not carry her burden of proof under the existing law by showing that Brent Moss, the alleged contemner, had the actual financial ability to comply with the order.

I

### FACTUAL AND PROCEDURAL BACKGROUND

The "Declaration for Contempt" in this matter,[1] executed by Tamara S. Ortiz on June 22, 1995, alleged that a judgment of dissolution filed March 17, 1992, ordered Brent N. Moss to pay $241.50 each, or a total of $483 a month support for the two children of the marriage, one-half due on the first and one-half due on the fifteenth day of each month, commencing on January 15, 1992. The order was modified on November 1, 1994,

---

[1]"A proceeding for the punishment of an indirect contempt is commenced by the presentation of an affidavit setting forth the alleged contemptuous acts. (Code Civ. Proc., § 1211.) The affidavit is in effect a complaint, frames the issues before the court and is a jurisdictional prerequisite to the court's power to punish." (*In re Gould* (1961) 195 Cal.App.2d 172, 175 [15 Cal.Rptr. 326].)

after which $385 was to be paid monthly, with semimonthly payments of $192.50. The declaration alleged that Brent had knowledge of the order and was able to comply with each order when it was disobeyed. No payments were made from July 1, 1994, through June 15, 1995. A total of $5,210 was due and unpaid.

Brent was unemployed when the support order was made. The amount to be paid was based on his ability to earn $1,671 gross income per month.

The declaration alleged 24 contempt counts and the court treated each of the 24 dates on which a payment had not been made as a separate count. The superior court issued an order to show cause on June 17, 1995, directing Brent to appear and show cause why he should not be found guilty of contempt for willful disobedience of the support order.

At the November 7, 1995, hearing on the order to show cause, Tamara testified that she and Brent, her then husband, were present when the support order was made and that he had not paid any support at all since July 1, 1994.

Brent's counsel assumed that Tamara bore the burden of proof on ability to pay support. On cross-examination Tamara testified that Brent did not have a car and at times had no food in his house. She was not aware of him having a job in the past four years, and did not know if he had any money or any ability to pay.

Betty Lou Moss, Brent's mother, testified that she provided Brent with a home. She paid the utilities expenses most times, but on other times he did so. He worked at odd jobs, and she did not know how much he earned from them. Brent often ate at her home. She did not know if he purchased food on his own. When the children were with him, they slept at his house, but he brought them to Betty Moss's home to eat. Betty Moss did not know if Brent ever fed them at his house. She did not remember how long it had been since Brent had a job. He did not discuss jobs with her. He did odd jobs like lawn mowing once in a while, but she did not know how much he earned. When she asked him about getting a job he said he was trying. He did not tell her what he was trying, however.

No other evidence was presented.

Counsel for Brent did not dispute the existence of a valid order for support, his client's knowledge of that order, and possible "willfulness," but argued that there had been no evidence of ability to comply with the support

order. He also argued that in a contempt proceeding to enforce a child support order, the citee need only raise the question of ability to comply, at which point the party seeking the contempt sanction had the burden of proving ability to comply beyond a reasonable doubt. In his view, inability to comply had been adequately raised by the evidence and compelling Brent to work under threat of punishment would constitute involuntary servitude.

Tamara's counsel argued that Brent had the burden of proving inability to comply with the order as an affirmative defense and that ability to comply did not require ability to pay the full amount of support ordered.

The court agreed that the burden of proving inability to comply lay with Brent and observed that there had been no evidence whatsoever that Brent was not able to work. The court found that Brent did have the ability to pay something in child support, as the evidence permitted an inference that he was receiving money from some source other than his mother. In partial explanation of that conclusion, the court stated that Brent was well dressed and had to be doing something to buy his own clothes and feed himself when he did not eat at his mother's home. The court also stated that Brent was "a person who could get a job flipping hamburgers at MacDonald's. . . . I don't know why he couldn't get a job at minimum wage. He's, in my mind, chosen not to." Brent's attorney then conceded that Brent had the ability to work. When asked later if there was a finding of ability to work, however, the court said only that Brent had "the ability to get money. Now, whether you want to say it's the ability to work, which there is no evidence that he can't, or the ability to get money from his mother, which he apparently freely does as he needs to . . . I am left with the inference that he has money from another source." The court also expressed the view that permitting a parent who had the ability to work and support the parent's children, but failed to do so, would make a "mockery" of the contempt power.

The court found Brent guilty of 24 counts of contempt,[2] but delayed imposition of sentence to permit Brent to seek appellate review. The only factual finding set forth in the minute order of November 7, 1995, was that "Respondent has the ability to pay the court ordered support."

After this petition for a writ of mandate was filed, the Court of Appeal noted that no sentence had yet been imposed and held the petition in abeyance pending that action. On March 5, 1996, the superior court imposed

---

[2]The number of separate contempt counts appears to exceed the current statutory limit. Effective January 1, 1995, the statute of limitations for contempt for failure to pay child support is three years from the date that each payment is due and a separate contempt count may be stated for each month for which payment is not made in full. (See Code Civ. Proc., § 1218.5.)

a sentence of five days in jail for each of six counts of contempt, and ordered Brent to perform ten hours of community servitude for each of the six counts.[3] Execution of sentence was stayed to permit Brent to purge himself of contempt by making specified payments, and he was placed on three years' informal probation. At that point the Court of Appeal issued its order to show cause in this mandate proceeding.

Brent's petition for a writ of mandate sought to set aside the contempt judgment on the ground that, although he raised the issue of inability to pay, Tamara presented no evidence that he had any resources with which to pay child support and therefore had the ability to comply with the order. Relying on *Todd, supra,* 119 Cal. 57, *Jennings, supra,* 133 Cal.App.3d 373, and *In re Brown* (1955) 136 Cal.App.2d 40 [288 P.2d 27] (*Brown*), he also claimed that, while the amount of support fixed by a child support order may be based on ability to earn, a finding of contempt may not be based on ability to earn. The Court of Appeal set aside the contempt judgment, holding that the evidence was not sufficient to prove that Brent had the ability to pay, and because *Todd* was controlling (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), the Court of

---

[3]We deem the minute orders reflecting these two rulings together to be the "judgment of contempt" in this matter. Code of Civil Procedure section 1218 provides that the finding of contempt is to be incorporated into the judgment of contempt (*Reifler* v. *Superior Court* (1974) 39 Cal.App.3d 479, 484 [114 Cal.Rptr. 356]), however. We therefore disapprove the practice reflected here. Moreover, while an indirect contempt judgment need not recite the court's factual findings as a jurisdictional prerequisite, those findings should be specifically recited orally or in the judgment to assist a reviewing court in determining if the evidence is sufficient to support the judgment of contempt.

Code of Civil Procedure section 1211, subdivision (a), which governs contempt committed in the immediate view and presence of the court, provides that a contempt order must recite the facts which occurred in the court's presence on which the contempt judgment is based. For indirect contempts such as this, the facts must be recited in the affidavit of the party seeking the contempt citation. (*Ibid.*) That affidavit may be amended. (Code Civ. Proc., § 1211.5.) If there is no objection to the sufficiency of the affidavit, "jurisdiction of the subject matter shall not depend on the averments of such affidavit or statement, but may be established by the facts found by the trial court to have been proved at such hearing, and the court shall cause the affidavit or statement to be amended to conform to proof." (Code Civ. Proc., § 1211.5, subd. (a).) Since there was no amendment of Tamara's affidavit, we necessarily infer that the court found true the facts recited in that affidavit. That affidavit did not allege that Brent had the ability to work, that suitable employment was available in the area in which he lived, or that he had refused the opportunity to engage in such employment.

Failure to recite, either orally or in its judgment of contempt, sufficient facts to show the basis for that finding, even in an indirect contempt, makes review of an indirect contempt judgment more difficult, however. The court is forced to examine the record to determine if the evidence supports any of the possible bases for a contempt finding reflected in the factual recitals of the affidavit. For that reason, although express findings are not a jurisdictional prerequisite to a judgment of indirect contempt, we do expect the court to recite a factual basis for its judgment, grounded in the evidence, orally or in the judgment. (See, e.g., *Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 904, fn. 4 [141 Cal.Rptr. 133, 569 P.2d 727].)

Appeal reluctantly concluded that he could not be adjudged in contempt based only on ability to earn. The Court of Appeal invited this court to reconsider *Todd*, at least in the context of child support, and we granted the petition for review of real party in interest for the purpose of doing so.

For the reasons stated below, we conclude that, insofar as *Todd* may apply to child support obligations, it should be disapproved.[4] The duty of a parent to support the parent's child or children is a fundamental parental obligation. We are satisfied that there is no constitutional impediment to use of the contempt power to punish a parent who, otherwise lacking monetary ability to pay child support, willfully fails and refuses to seek and accept available employment commensurate with the parent's skills and abilities.

II

*Todd, Brown, and Jennings*

■ This court's opinion in *Todd, supra,* 119 Cal. 57, is the apparent source of the belief that imposition of a contempt sanction on a parent who willfully disables himself or herself from having the ability to comply with a child support order is constitutionally impermissible. Tamara argues that, regardless of whether *Todd* was based on the constitutional prohibition of slavery and involuntary servitude or on the proscription of imprisonment for debt, it should be disapproved or overruled. Supported by amicus curiae Appellate Committee of the California District Attorneys Association, she asks the court to reconsider *Todd*.

The one-page *Todd* opinion offered no explanation for its holding that the court lacked power to punish a person for failing to seek employment in order to pay spousal support. In *Todd* the contemner discontinued making court-ordered alimony payments to his ex-wife. After a hearing on an order to show cause re contempt, the court found that the contemner had no money or other means of payment and had not committed a fraud on his creditors by disposing of property. The court also found that the contemner had been allowed a month within which to seek employment so that he could earn money to make the weekly alimony payments, but had made no effort to obtain employment. He was committed to jail until he paid the $200 then due.

This court held: "This order was clearly in excess of the power of the court, which cannot compel a man to seek employment in order to earn

---

[4]As this matter involves only a child support obligation, we have no occasion to consider whether *Todd* should be overruled in toto.

money to pay alimony, and punish him for his failure to do so." (*Todd, supra*, 119 Cal. at p. 58.)

*Todd* was followed by *Brown, supra*, 136 Cal.App.2d 40, a case in which the habeas corpus petitioner had been sentenced to a five-day jail term for failure to comply with a judgment ordering him to pay alimony. The affidavit in support of the contempt citation was construed by the Court of Appeal to allege that the contemner had insufficient money to comply due to his being unemployed. The court concluded that there had been a sufficient showing of ability to work, but this was inadequate. "If ability to work in remunerative employment was, in a pertinent legal sense, ability to comply with the mandate of the judgment, and if it had been alleged that petitioner wilfully refused to work for the express purpose of avoiding compliance with his obligations, the affidavit would have been sufficient. But mere ability to work is not the same as ability to pay." (*Brown, supra*, 136 Cal.App.2d at p. 43.) The court then noted that *Todd* was still the controlling law, quoting the opinion, but went on to say: "Cases holding that a husband who has no money but has the ability to work may be ordered to pay support money to his wife (*Dimon* v. *Dimon* [(1953)] 40 Cal.2d 516 [254 P.2d 528]) are not in point. Also inapplicable is the rule that one may be punished for contempt if he wilfully and voluntarily puts it out of his power to comply with a court mandate. Our courts have never applied the rule to the case of a husband who has no money, but having ability to obtain employment fails or refuses to do so. [¶] As we have stated, the affidavit did not allege that petitioner gave up his employment voluntarily or refused to accept employment that was available." (*Id.* at pp. 43-44.)

The habeas corpus petitioner in *Jennings, supra*, 133 Cal.App.3d 373, had been sentenced to 60 days in jail following a finding that he was in contempt of court for failure to pay spousal support and attorney fees. He claimed that, since there was proof that he did not have the ability to pay, the order was in excess of the court's jurisdiction because it imprisoned him for a debt that he could not pay. At the time of the proceedings the petitioner, an architect, was unemployed and had no assets, but the contempt court found that he had the ability to earn $80,000 per year. He had received unrestricted personal loans and unemployment insurance during the period in which alimony payments were due. The contempt court found that he had "willfully and unjustifiably quit working to avoid his financial obligation of spousal support" and had allowed his business interests to depreciate to the point at which they were practically useless. (133 Cal.App.3d at p. 379.) Because the contemner had voluntarily ceased work, the court had made the support order on the basis of his ability to earn, rather than on his current earnings.

The court found with respect to each count that the petitioner had the ability to pay the support obligation in full and had willfully and intentionally failed to do so, and even though he had the ability to employ himself, he

had deliberately refused to employ himself so as to be unable to make the payments.

Relying on its understanding of *Todd* and *Brown*, the *Jennings* court held that the contempt order was in excess of the court's jurisdiction because it was based on capacity to earn rather than actual ability to pay. (*Jennings, supra,* 133 Cal.App.3d at p. 380.) The court recognized that it is permissible to base an order for support on earning capacity rather than actual income when there is evidence of an attempt to avoid family financial responsibilities by refusing to seek employment. It concluded nonetheless that a contempt sanction could not be imposed for failure to comply with the support order. It found in *Todd* a clear implication that federal and state constitutional provisions barring involuntary servitude were applicable. (*Id.* at p. 383.) Citing *Pollock* v. *Williams* (1944) 322 U.S. 4, 18 [64 S.Ct. 792, 799, 88 L.Ed. 1095], the court found no difference in the imprisonment of the petitioner for failure to employ himself and other constitutionally impermissible practices where, under threat of criminal sanction, a person is compelled to work in order to force that person to pay a debt (133 Cal.App.3d at p. 384), and ultimately held that it was "bound by the holding in *Ex parte Todd, supra,* 119 Cal. 57 that contempt may not be applied to incarcerate [petitioner] because he is unemployed." (*Id.* at p. 386.)

### III

#### INVOLUNTARY SERVITUDE

We shall assume, as did the *Jennings* court, that the *Todd* holding was based on the constitutional proscriptions of involuntary servitude or imprisonment for debt. We consider each in turn, examining first the circumstances which may constitute involuntary servitude within the meaning of the Thirteenth Amendment of the federal Constitution and article I, section 6 of the California Constitution (article I, section 6).

A. *Thirteenth Amendment.*

Section 1 of the Thirteenth Amendment of the federal Constitution provides: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."[5]

The Thirteenth Amendment, unlike the Fourteenth Amendment, prohibits conduct by private persons as well as governmental entities. It has been

---

[5]The Thirteenth Amendment was ratified in 1865. Vermont was the first state to ban involuntary servitude, doing so almost a century before the Thirteenth Amendment was adopted. The Vermont Constitution of 1777 declared: "[N]o male person, born in this country,

construed and applied primarily to circumstances in which one individual sought to compel work by another. In its decisions applying the Thirteenth Amendment, the United States Supreme Court has recognized that many fundamental societal obligations involving compelled labor do not violate the proscription of involuntary servitude. It has never held that employment undertaken to comply with a judicially imposed requirement that a party seek and accept employment when necessary to meet a parent's fundamental obligation to support a child is involuntary servitude.

In those decisions in which a Thirteenth Amendment violation has been found on the basis of involuntary servitude, the court has equated the employment condition to peonage under which a person is bound to the service of a particular employer or master until an obligation to that person is satisfied.[6] A court order that a parent support a child, compliance with which may require that the parent seek and accept employment, does not bind the parent to any particular employer or form of employment or otherwise affect the freedom of the parent. The parent is free to elect the type of employment and the employer, subject only to an expectation that to the extent necessary to meet the familial support obligation, the employment will be commensurate with the education, training, and abilities of the parent.

---

or brought from over sea, ought to be holden by law, to serve any person, as a servant, slave or apprentice, after he arrives to the age of twenty-one years, nor female, in like manner after she arrives to the age of eighteen years, unless they are bound by their own consent, after they arrive to such age, or bound by law, for the payment of debts, damages, fines, costs, or the like." Ohio (Ohio Const. (1802), art. VIII, § 2), Indiana (Ind. Const. (1816), art. 11, § 7), Illinois (Ill. Const. (1818), art. VI, § 1), and Michigan (Mich. Const. (1835), art. XI, § 1) followed with similar provisions. Some state constitutions, while prohibiting slavery and involuntary servitude, expressly permitted contracts for apprenticeship and indenture if voluntarily entered into for valuable consideration. (See Alvins, *Freedom of Choice in Personal Service Occupations: Thirteenth Amendment Limitations on Antidiscrimination Legislation* (1964) 49 Cornell L.Q. 228, 230 (Alvins).)

The Northwest Ordinance, adopted by Congress in 1787 for the governance of the Northwest Territory, included a provision prohibiting involuntary servitude. The words "slavery" and "involuntary servitude" as used in the Thirteenth Amendment were taken from the Northwest Ordinance. (*Bailey* v. *Alabama* (1911) 219 U.S. 219, 240 [31 S.Ct. 145, 151, 55 L.Ed. 191]; 1 Schwartz, Statutory History of the United States: Civil Rights (1970) p. 24 (Schwartz).) "Fundamentally, the Northwest Ordinance, 1 Stat. 53 (1787), followed the draft by Thomas Jefferson of the *Ordinance of 1784*, and was directed against the legal enforcement of 'conditional servitude under indentures or covenants,' a practice which had long existed in Virginia, 'at least to the extent that such indentures were not entered into voluntarily without the compulsion of a previously existing debt or obligation . . . .' " (Shapiro, *Involuntary Servitude: The Need for a More Flexible Approach* (1964) 19 Rutgers L.Rev. 65, 72, fn. 38, original italics (Shapiro).)

[6]Although "hold[ing]" a person "in involuntary servitude" is proscribed by Penal Code section 181, and taking a person out of this state with intent to sell the person into involuntary servitude is proscribed by Penal Code section 207, it appears that the term as used in those statutes has not been construed in a reported case.

Because the *Jennings* court cited *Pollock* v. *Williams*, *supra*, 322 U.S. 4 (*Pollock*), as support for its conclusion, and because in that opinion the Supreme Court observed that its past decisions enforcing the Thirteenth Amendment ban on involuntary servitude had been misunderstood and attempted to clarify that area of constitutional law, our exploration of the scope of "involuntary" servitude necessarily begins with *Pollock*.

*Pollock* considered a Florida statute that made it a misdemeanor to induce a monetary advance with intent to defraud by a promise to perform labor. The statute also made failure to perform the labor for which money had been obtained prima facie evidence of intent to defraud. The statute was invalidated under both the Thirteenth Amendment and the Antipeonage Act because it compelled involuntary servitude. The court explained the nature of the servitude the Constitution prohibits: "The undoubted aim of the Thirteenth Amendment as implemented by the Antipeonage Act was not merely to end slavery but to maintain a system of completely free and voluntary labor throughout the United States. Forced labor in some special circumstances may be consistent with the general basic system of free labor. For example, forced labor has been sustained as a means of punishing crime, and there are duties such as work on highways which society may compel. But in general the defense against oppressive hours, pay, working conditions, or treatment is the right to change employers. When the master can compel, and the laborer cannot escape, the obligation to go on, there is no power below to redress and no incentive above to relieve a harsh overlordship or unwholesome conditions of work. Resulting depression of working conditions and living standards affects not only the laborer under the system but every other with whom his labor comes in competition. Whatever of social value there may be, and of course it is great, in enforcing contracts and collection of debts, Congress has put it beyond debate that no indebtedness warrants a suspension of the right to be free from compulsory service. This congressional policy means that no state can make the quitting of work any component of a crime, or make criminal sanctions available for holding unwilling persons to labor. The federal statutory test is a practical inquiry into the utilization of an act as well as its mere form and terms. [¶] Where peonage has existed in the United States it has done so chiefly by virtue of laws like the statute in question." (*Pollock, supra,* 322 U.S. at pp. 17-18 [64 S.Ct. at p. 799], fns. omitted.)[7]

The obligation of a parent to support a child, and to become employed if that is necessary to meet the obligation, is in no way comparable or akin to

---

[7]The implementing legislation to which the court referred was the Antipeonage Act of 1867, 14 Statutes at Large 546, which made "holding of any person to service or labor under the system known as peonage" unlawful. It nullified all state or territorial laws which attempt "to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise." (*Ibid.*)

peonage or slavery. It is among the most fundamental obligations recognized by modern society. The duty is not simply one imposed by statute, but "rests on fundamental natural laws and has always been recognized by the courts in the absence of any statute declaring it." (*Lewis* v. *Lewis* (1917) 174 Cal. 336, 339 [163 P. 42].) It is an obligation that existed under common law (*In re Ricky H.* (1970) 2 Cal.3d 513, 520 [86 Cal.Rptr. 76, 468 P.2d 204]) and has long been recognized in a majority of American jurisdictions as not only a moral obligation, but one that is legally enforceable. (Schuele, *Origins and Development of the Law of Parental Child Support* (1988-1989) 27 J. Fam. L. 807, 814-815.)[8]

The United States Supreme Court has consistently recognized that the Thirteenth Amendment does not prevent enforced labor as punishment for crime, and does not prevent state or federal governmental entities from compelling the performance of civic duties such as jury service (*Hurtado* v. *United States* (1973) 410 U.S. 578, 589 [93 S.Ct. 1157, 1164, 35 L.Ed.2d 508], fn. 11), military service (*Selective Draft Law Cases* (1918) 245 U.S. 366, 390 [38 S.Ct. 159, 165, 62 L.Ed. 349],[9] and road work (*Butler* v. *Perry* (1916) 240 U.S. 328, 333 [36 S.Ct. 258, 259-260, 60 L.Ed. 672]). A parent's obligation to support a minor child is a social obligation that is no less important than compulsory military service, road building, jury service and other constitutionally permissible enforced labor. Even if the necessity of accepting employment in order to meet this obligation were somehow analogous to those forms of compelled labor, we have no doubt that this form of labor would be recognized as an exception to the ban on involuntary servitude found in the Thirteenth Amendment. It is clear to us, however, that employment undertaken to meet a child support obligation is not analogous to government-controlled labor and does not otherwise create a condition of peonage or slavery. Unlike those recognized exceptions to the Thirteenth Amendment in which labor is compulsory, undertaking employment because an income is necessary to enable a parent to comply with a valid court order to support a child does not impose on the parent any government control over the type of employment, the employer for whom the parent's labor will be performed, or any other aspect of the parent's individual freedom that might be associated with peonage or slavery.

The Supreme Court's construction and application of the "involuntary servitude" aspect of the Thirteenth Amendment has not changed since the

---

[8]The state's interest in and public policy mandating parental support of children is so strong that jurisdictions faced with the question hold that it extends even to juvenile fathers who were the victims of statutory rape by adult women. (See *State* ex rel. *Hermesmann* v. *Seyer* (1993) 252 Kan. 646 [847 P.2d 1273]; *In re J.S.* (1990) 193 Ill.App.3d 563 [140 Ill.Dec. 621, 550 N.E.2d 257]; *Com.* v. *A Juvenile* (1982) 387 Mass. 678 [442 N.E. 2d 1155]; *In re Paternity of J.L.H.* (1989) 149 Wis.2d 349 [441 N.W.2d 273].

[9]See also *Claudius* v. *Davie* (1917) 175 Cal. 208 [185 P. 689].

*Pollock* decision. Involuntary servitude is found only when a person is held to labor under conditions akin to peonage or slavery. The issue arose most recently in *United States* v. *Kozminski* (1988) 487 U.S. 931 [108 S.Ct. 2751, 101 L.Ed.2d 788], in which the validity of convictions for violation of 18 United States Code sections 241 and 1584 was in issue. Those statutes respectively prohibit any conspiracy to deny rights secured by the United States Constitution, which include the Thirteenth Amendment right to be free from involuntary servitude, and willfully holding another person in involuntary servitude. The court was called upon to determine the meaning of involuntary servitude under the statutes.

The Supreme Court first acknowledged that both statutes were enacted under Congress's power to enforce the Thirteenth Amendment. Because 18 United States Code section 241 prohibits interference with rights guaranteed by the Thirteenth Amendment, the court was required to look to the scope of that amendment's prohibition of involuntary servitude. (*United States* v. *Kozminski, supra,* 487 U.S. at p. 941 [108 S.Ct. at p. 2759].) Reviewing its past Thirteenth Amendment decisions the court summarized the reasoning of those decisions. "The primary purpose of the Amendment was to abolish the institution of African slavery as it had existed in the United States at the time of the Civil War, but the Amendment was not limited to that purpose; the phrase 'involuntary servitude' was intended to extend 'to cover those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results.' *Butler* v. *Perry*, 240 U.S. 328, 332 [36 S.Ct. 258, 259, 60 L.Ed. 672] (1916). See also *Robertson* v. *Baldwin*, 165 U.S. 275, 282 [17 S.Ct. 326, 329, 41 L.Ed. 715] (1897); *Slaughter-House Cases* (1873) 83 U.S. (16 Wall.) 36, 69 [21 L.Ed. 394].

"While the general spirit of the phrase 'involuntary servitude' is easily comprehended, the exact range of conditions it prohibits is harder to define. The express exception of involuntary servitude imposed as a punishment for crime provides some guidance. The fact that the drafters felt it necessary to exclude this situation indicates that they thought involuntary servitude includes at least situations in which the victim is compelled to work by law. Moreover, from the general intent to prohibit conditions 'akin to African slavery,' see *Butler* v. *Perry, supra,* at 332-333 [36 S.Ct. at p. 259], as well as the fact that the Thirteenth Amendment extends beyond state action, compare U.S. Const., Amdt. 14, § 1, we readily can deduce an intent to prohibit compulsion through physical coercion." (487 U.S. at p. 942 [108 S.Ct. at pp. 2759-2760].)

The court then looked to the "actual holdings" of its cases and found "that in every case in which this Court has found a condition of involuntary

servitude, the victim had no available choice but to work or be subject to legal sanction." (487 U.S. at pp. 942-943 [108 S.Ct. at p. 2760].) In each of the cases to which the court referred, however, the compulsion was not simply to find work because income was needed to comply with a valid child support order, but to work for a particular individual or entity. *Clyatt* v. *United States* (1905) 197 U.S. 207 [25 S.Ct. 429, 49 L.Ed. 726] held that peonage included coercing a person under threat of legal sanction to work off a debt to the master. *United States* v. *Reynolds* (1914) 235 U.S. 133 [35 S.Ct. 86, 59 L.Ed. 162] invalidated a system under which a person subject to a misdemeanor fine could contract to work for a surety who would pay the fine, the "critical feature" (487 U.S. at p. 943 [108 S.Ct. at p. 2760]) of which made it a crime to breach the labor contract. The court also cited *Pollock, supra,* 322 U.S. 4, and *Bailey* v. *Alabama, supra,* 219 U.S. 219, in both of which failure to perform services for which money had been advanced was prima facie evidence of intent to defraud and criminal sanctions were imposed for the failure.

The court has also reaffirmed its understanding that the Thirteenth Amendment was not intended to apply to "exceptional cases" in which the right to labor was recognized at common law when the amendment was adopted. Examples given were the right of parents to the custody of children, whose labor could be compelled by the parent, and laws which prevent persons who have contracted to work aboard a ship from deserting the ship. (487 U.S. at p. 944 [108 S.Ct. at p. 2760].)[10] *Kozminski* itself involved a charge that the defendant held retarded farm laborers in involuntary servitude.

Summarizing its conclusion the court observed that "our precedents clearly define a Thirteenth Amendment prohibition of involuntary servitude enforced by the use or threatened use of physical or legal coercion. The guarantee of freedom from involuntary servitude has never been interpreted specifically to prohibit compulsion of labor by other means, such as psychological coercion." (487 U.S. at p. 944 [108 S.Ct. at p. 2760].)

While the court also cautioned that it drew no conclusions from its historical survey about the potential scope of the Thirteenth Amendment,

---

[10] Other forms of "coerced" service which courts have held do not violate the Thirteenth Amendment include providing equal access to public accommodations (*Atlanta Motel* v. *United States* (1964) 379 U.S. 241 [85 S.Ct. 348, 13 L.Ed.2d 258] [codification of common law duty of innkeeper]); community service requirement for high school graduation (*Immediato* v. *Rye Neck School Dist.* (2d Cir. 1996) 73 F.3d 454; *Steirer by Steirer* v. *Bethlehem Area School Dist.* (3d Cir. 1993) 987 F.2d 989 [no analogy to slavery]); provision of free legal service as condition of practicing law (*United States* v. *30.64 Acres of Land* (9th Cir. 1986) 795 F.2d 796); performance of medical services after acceptance of scholarship money to complete degree (*U.S.* v. *Redovan* (E.D.Pa. 1986) 656 F.Supp. 121 [damages alternative available]).

and used broad language regarding physical or legal coercion, to date the only types of compelled labor it has characterized as involuntary servitude have been ones "akin to peonage."[11] This understanding of the meaning of "involuntary servitude" is reflected in the high court's opinion applying the Thirteenth Amendment in *Bailey* v. *Alabama, supra,* 219 U.S. 219: "The words involuntary servitude have a 'larger meaning than slavery.' 'It was very well understood that in the form of apprenticeship for long terms, as it had been practiced in the West India Islands, on the abolition of slavery by the English government, or by reducing the slaves to the condition of serfs attached to the plantation, the purpose of the article might have been evaded, if only the word slavery had been used.' *Slaughter House Cases,* 16 Wall. p. 69. The plain intention was to abolish slavery of whatever name and form and all its badges and incidents; to render impossible any state of bondage; to make labor free, by prohibiting that control by which the personal service of one man is disposed of or coerced for another's benefit which is the essence of involuntary servitude." (*Id.* at p. 241 [31 S.Ct. at p. 151].) "The Thirteenth Amendment prohibits involuntary servitude except as punishment for crime. But the exception . . . does not permit slavery or involuntary servitude to be established or maintained through the operation of the criminal law by making it a crime to refuse to submit to the one or to render the service which would constitute the other. The State may impose involuntary servitude as a punishment for crime, but it may not compel one man to labor for another in payment of a debt, by punishing him as a criminal if he does not perform the service or pay the debt." (*Id.* at pp. 243-244 [31 S.Ct. at p. 152].)

That only compulsion to labor under conditions akin to peonage or slavery was contemplated by the "involuntary servitude" language of the Thirteenth Amendment is also suggested by the debates in Congress that preceded approval and in the Civil Rights Act of April 9, 1866. There was no discussion of involuntary servitude during the debate on the Thirteenth Amendment other than the observation of Senator Sumner that inclusion of "involuntary servitude" was a surplusage that might create a doubt. (See Alvins, *supra,* 49 Cornell L.Q. at p. 234.) Otherwise that debate appears to have centered exclusively on whether slavery could and should be prohibited. (Alvins, *supra,* 49 Cornell L.Q. at pp. 235-236; see also Schwartz, *supra,* pp. 25-96.) It appears from this that all assumed that involuntary servitude was a condition of servitude indistinguishable from slavery, a

---

[11]This understanding of the Thirteenth Amendment underlies the concern expressed in California decisions declining specific enforcement of contracts for personal services that such enforcement might constitute impermissible involuntary servitude. (See, e.g., *Poultry Producers etc.* v. *Barlow* (1922) 189 Cal. 278, 288 [208 P. 93]; *Wooley* v. *Embassy Suites, Inc.* (1991) 227 Cal.App.3d 1520, 1533 [278 Cal.Rptr. 719]; *Beverly Glen Music, Inc.* v. *Warner Communications, Inc.* (1986) 178 Cal.App.3d 1142, 1144 [224 Cal.Rptr. 260].)

conclusion supported by the Civil Rights Act of April 9, 1866, section 2 of which provided criminal penalties for denial of the rights secured by the act "on account of such person having at any time been held in a condition of slavery or involuntary servitude. . . ." As with the Thirteenth Amendment itself, the debate on this statute seems to equate involuntary servitude, which was not distinguished, with slavery.

The debate on the Antipeonage Act of March 2, 1867, again suggests that involuntary servitude was understood, at the time the Thirteenth Amendment was passed, to refer to compelled service such as that required under an apprenticeship. Peonage was considered to be a form of involuntary servitude. (Schwartz, *supra*, at p. 167; see also *Clyatt* v. *United States, supra*, 197 U.S. at p. 215 [25 S.Ct. at p. 430] ["But peonage, however created, is compulsory service, involuntary servitude."].) "The essential difference between the terms [involuntary servitude and peonage] is that *peonage* requires the additional element of indebtedness." (Shapiro, *supra*, 19 Rutgers L.Rev. at p. 73, original italics.) The Antipeonage Act was made necessary by the continuation of a system of peonage inherited from Spanish rule in the Territory of New Mexico and a practice of forced labor by Native Americans. (*Ibid.*) When Representative Bingham moved passage of the bill in the House of Representatives he explained that it would invalidate all state and territorial laws which "establish, maintain, or enforce, directly or indirectly, the involuntary or involuntary service of labor of any persons as peons in liquidation of any debt or obligation." (Schwartz, *supra*, at p. 171; see also Brodie, *The Federally Secured Right to be Free From Bondage* (1952) 40 Geo. L.J. 367, 376-377.)

In *United States* v. *Shackney* (2d Cir. 1964) 333 F.2d 475, 476, the court was called upon to determine the meaning of involuntary servitude as used in 18 United States Code section 1584. That statute imposed punishment on a person who "knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held." (*Ibid.*) Looking to the history of the term and its origins in the Northwest Ordinance, which was believed to have been drafted by Thomas Jefferson, the court concluded: "It seems reasonably plain that what Jefferson meant to ban by the words 'involuntary servitude' was the legal enforcement of 'conditional servitude under indentures or covenants' such as had long existed in Virginia, see 1 Bancroft, History of the United States 175 (1859 ed.); Miller, New History of the United States 70-73 (1958), at least to the extent that such indentures were not entered into voluntarily without the compulsion of a previously existing debt or obligation." (333 F.2d at p. 483.) The court then looked to an early state court decision construing the Thirteenth Amendment, *Tyler* v.

*Heidorn* (N.Y. Ch. 1866) 46 Barb. Ch. 439, 458, where the court said: " 'The term *involuntary servitude*, in my opinion, is substantially synonymous with *slavery*, though it may perhaps be regarded as slightly more comprehensive, and as embracing every thing under the name of *servitude*, though not denominated slavery, which gives to one person the control and ownership of the involuntary and compulsory *services* of another against his will and consent.' " (333 F.2d at pp. 484-485.) After considering the Supreme Court's construction of the term in the *Slaughter-House Cases* (1873) 83 U.S. (16 Wall.) 36 [21 L.Ed. 394] and *Butler* v. *Perry, supra,* 240 U.S. 328, the court concluded: "[T]he prime purpose of those who outlawed 'involuntary servitude' in the predecessors of the 13th Amendment, in the Amendment itself, and in statutes enacted to enforce it, was to abolish all practices whereby subjection having some of the incidents of slavery was legally enforced, either directly, by a state's using its power to return the servant to the master . . . or indirectly by subjecting persons who left the employer's service to criminal penalties. . . . [A] holding in involuntary servitude means to us action by the master causing the servant to have, or to believe he has, no way to avoid continued service or confinement . . . not a situation where the servant knows he has a choice between continued service and freedom, even if the master has led him to believe that the choice may entail consequences that are exceedingly bad." (333 F.2d at pp. 485-486, fn. omitted.)

Professor Alvins, after his review of pre-Civil War cases, constitutions, and legislation in which the term was used, concluded: "From the above two cases [*Phoebe* v. *Jay* (1828) 1 Ill. 268 and *Matter of Clark* (Ind. 1821) 1 Black. 134] it can be seen that the words 'involuntary servitude,' as found in the Northwest Ordinance, and incorporated into the state constitutions of Illinois, Indiana, Michigan, and Ohio, have their ordinary and natural meaning. They mean service or labor which is not, at all times, performed voluntarily, and without any legal or other compulsion. The agreement to serve must be entered into without coercion, and must be completed without coercion. The provision, in short, banned any sanctions which compelled one person to work for another, for however short a period of time." (Alvins, *supra,* 49 Cornell L.Q. at p. 232.)

As the authorities reviewed above demonstrate, the court's approach in cases of alleged involuntary servitude has been contextual. No single definition of the term has evolved and each situation must be examined to determine if it bears the indices of peonage or slavery. To date however, neither the Supreme Court nor any state court that has enforced a child support order has suggested that undertaking gainful employment in order to avoid sanctions for violation of a valid child support order is analogous to the peonage or involuntary servitude prohibited by the Thirteenth Amendment. Employment chosen by the employee which the employee is free to

leave, either in favor of another employer or if the working conditions are objectively intolerable, is simply not "akin to peonage." It does not become so because a person would prefer not to work but must do so in order to comply with a legal duty to support the person's children. As the court said in *Immediato* v. *Rye Neck School Dist., supra*, 73 F.3d at page 459: "In application, courts have consistently found the involuntary servitude standard is not so rigorous as to prohibit all forms of labor that one person is compelled to perform for the benefit of another. The Thirteenth Amendment does not bar labor that an individual may, at least in some sense, choose not to perform, even where the consequences of that choice are 'exceedingly bad.' "

Our conclusion is consistent with decisions of lower federal courts which have addressed the issue in criminal cases charging defendants with holding other persons in slavery or involuntary servitude in violation of federal law. (See, e.g., *United States* v. *Mussry* (9th Cir. 1984) 726 F.2d 1448, 1453.)

The United States Court of Appeals for the Third Circuit, in *Steirer by Steirer* v. *Bethlehem Area School Dist., supra*, 987 F.2d 989, 1000, recognized that the Supreme Court and other circuits have taken a "contextual approach" in assessing whether compelled labor constitutes involuntary servitude. It concluded that in such assessments the courts have confined the Thirteenth Amendment to conditions that "are truly 'akin to African slavery.' " (*Ibid.*) Thus, in *U.S.* v. *King* (6th Cir. 1988) 840 F.2d 1276, members of a religious sect were found to have violated 18 United States Code section 1584 through the use and threats of use of physical force to compel children to perform labor. In *United States* v. *Booker* (4th Cir. 1981) 655 F.2d 562, involuntary servitude was found where migrant farm workers were forbidden to leave a labor camp without paying their debts, and the edict was enforced by threats of physical harm, actual infliction of physical injury, and the forced return of those who left. By contrast, imposing an obligation on an attorney to serve without compensation under court appointment in some cases is not involuntary servitude since the obligation to serve indigents is an ancient, established tradition which an attorney accepts as a condition of practicing law (*United States* v. *30.64 Acres of Land, supra*, 795 F.2d 796, 800), and compelling a sheriff to comply with federal law mandating background checks of purchasers of firearms is not involuntary servitude since the obligation is imposed on the officeholder, not the incumbent, who can always resign the office and avoid the obligation. (*Mack* v. *U.S.* (9th Cir. 1995) 66 F.3d 1025,1034.)[12]

When, as here, however, the person claiming involuntary servitude is simply expected to seek and accept employment, if available, and is free to

---

[12]Some courts have simply dismissed involuntary servitude claims made in the context of support-related orders to find employment as meritless without discussion or analysis. (See,

choose the type of employment and the employer, and is also free to resign that employment if the conditions are unsatisfactory or to accept other employment, none of the aspects of "involuntary servitude" which invoke the need to apply a contextual approach to Thirteenth Amendment analysis are present. There is no "servitude" since the worker is not bound to any particular employer and has no restrictions on his freedom other than the need to comply with a lawful order to support a child. Working to earn money to support a child is not involuntary servitude any more than working in order to pay taxes. Failure to do either may subject one to civil and criminal penalties, but that compulsion or incentive to labor does not create a condition of involuntary servitude.

Brent cites no authority and we find none that supports a conclusion that the Thirteenth Amendment precludes imposition of either contempt sanctions or criminal penalties for violation of a criminal child support statute when the violation is the result of a willful failure to seek and/or accept employment when employment is necessary to comply with a support obligation. In *Commonwealth* v. *Pouliot, supra*, 292 Mass. 229, 231-232 [198 N.E. 256, 257], the Massachusetts Supreme Court rejected a claim like that made here deeming this type of obligation to be one of the exceptional forms of service, and holding that "[t]he obligation of a husband and father to maintain his family, if in any way able to do so, is one of the primary responsibilities established by human nature and by civilized society." Consistent with our understanding of the Thirteenth Amendment and our conclusion that whatever compulsion to labor there may be here it does not create a condition akin to peonage, Professor Alvins comments about that decision: "Of course, this case does not hold that the husband is required to perform any particular kind of work to support his family. He may choose any work and any employer, if able. But if nothing else presents itself, he must work at what he can get." (Alvins, *supra*, 49 Cornell L.Q. at p. 239.)[13]

Brent relies on *Todd, Brown, Jennings*, and *Pollock*, but he does not acknowledge that neither *Pollock* nor any other Supreme Court decision

e.g., *Freeman* v. *Freeman* (D.C. 1979) 397 A.2d 554, 557, fn. 2 ["This contention has no merit."]; *McKenna* v. *Steen* (La.Ct.App. 1982) 422 So.2d 615, 618 ["These allegations are so ludicrous that they hardly dignify a response. . . . The [order refusing to reduce child support obligation of dentist who left practice] merely imposes . . . [the] inherent obligation to support his minor children. . . . We find no constitutional impingement."]; *Commonwealth* v. *Pouliot* (1935) 292 Mass. 229, 231 [198 N.E. 256, 257] ["Manifestly, it is not slavery or involuntary servitude as thus authoritatively defined to sentence this defendant if he fails to perform his duty to support his family. . . . The statute enforces this duty by appropriate sanctions."]; *Warwick* v. *Warwick* (Minn.Ct.App. 1989) 438 N.W.2d 673, 679 [order to seek work—rationale of out-of-state cases rejecting Thirteenth Amendment claim consistent with Minnesota law although not previously considered by Minnesota courts].)

[13]Cases in which the constitutional argument was not raised reflect a well-established assumption that the defense of inability to comply with a support order may be overcome if the prosecutor proves that a parent or spouse under a support order could have obtained

holds that a condition of involuntary servitude exists when a person is free to choose and to leave the service of his or her employer, and is bound only to seek and accept employment when necessary to enable that person to fulfill a parental child support obligation. Because Tamara emphasizes the special parental support obligation as a basis for overruling *Todd*, Brent argues that a child support obligation should not be recognized as an exception to a rule otherwise "universally applicable" to the enforcement of monetary obligations. As we have shown, however, the rule is not as broad as Brent would have it. The obligation to support a child is not a contractual obligation entered into with knowledge that neither specific performance of personal services nor payment of a resulting debt may be enforced by imprisonment. Instead, parenthood is a status which is accompanied by a legally enforceable obligation to support one's child or children. The obligation to comply with a child support order and to work if necessary to do so does not constitute involuntary servitude.[14]

### B. *Article I, section 6.*

Article I, section 6, provides: "Slavery is prohibited. Involuntary servitude is prohibited except to punish crime." When considering involuntary servitude issues we have assumed that the protection extended by article I, section 6, is coextensive with that accorded by the Thirteenth Amendment. (See, e.g., *Johnson* v. *Calvert* (1993) 5 Cal.4th 84, 96 [19 Cal.Rptr.2d 494, 851 P.2d 776].) While the parties do not contend otherwise, we have examined the history of article I, section 6, and find nothing contrary to that assumption.

The proscription of involuntary servitude appeared in the California Constitution of 1849 as section 18 of article I. Article I, former section 18 read: "Neither slavery, nor involuntary servitude, unless for the punishment of crime, shall ever be tolerated in this State."

---

employment. (See *People* v. *Forester* (1916) 29 Cal.App. 460 [155 P. 1022]; *State* v. *Bess* (1913) 44 Utah 39 [137 P. 829]; *Goddard* v. *State* (1905) 73 Neb. 739 [103 N.W. 443].)

[14]Brent also argues that since petitioner has not challenged the conclusion of the Court of Appeal that the evidence was insufficient to establish that he had the ability to comply with the support order and the affidavit did not allege or the evidence show that he had refused available employment, the contempt judgment cannot stand. Therefore, as resolution of the constitutional question is unnecessary, Tamara seeks only an advisory opinion. As is apparent, however, resolution of that question, and consideration of the applicability of *Todd*, is necessary to guide the trial court and the Court of Appeal in any future proceedings in which it is alleged that subsequent to this decision the child support order has not been obeyed. And, as noted earlier, the Court of Appeal itself urged that *Todd* be reconsidered. The importance of the question merits review notwithstanding the alternative basis for the Court of Appeal holding. (See *County of Marin* v. *Superior Court* (1960) 53 Cal.2d 633, 640 [2 Cal.Rptr. 758, 349 P.2d 526].)

The measure was inserted into the draft of the "Declaration of Rights" during consideration of article I by the convention sitting as a committee of the whole. There was no debate at that time or when the convention itself approved it. (Rep. of Debates in the Convention of Cal. on Formation of the State Constitution (1850) pp. 43, 86 (hereafter 1849 Debates); see also Grodin et al., The California State Constitution: A Reference Guide (1993) pp. 7, 45.)

At the 1878 Constitutional Convention a proposal was made to change the language to conform to that of the Thirteenth Amendment by adding after "crime" the words "of which the party has been duly convicted." The explanation of Mr. Van Dyke, the proponent, reflects an assumption that the two provisions were coextensive. Mr. Van Dyke stated that the purpose of the change "was to make it conform to the language of the thirteenth amendment of the Constitution of the United States . . . . That language is taken from the Constitution of Alabama. I call attention of the members to the fact that there is no such thing as slavery for the punishment of crimes, which is the way it stands in the old section. It has reference to slavery as well as to involuntary servitude, so we thought best to put it in this form, that there shall be no form of slavery in this State. . . . There is no such thing as 'slavery for the punishment of crime.' It means involuntary servitude for the punishment of crime." (1 Debates & Proceedings, Cal. Const. Convention 1878-1879, p. 270.) Mr. Edgerton opposed the motion only because he thought the 1849 provision was clear, stating: "This Convention will do well to adhere as strictly as may be with safety to the language, text, and spirit of the old Constitution; to depart from it in no instance, unless there is some real necessity for the change. The old section . . . is precisely the same thing, and with due respect to the gentlemen it is much more aptly expressed in the old Constitution, and I hope it will be adopted." (Ibid.) The draft provision, in its original form, was approved with no further debate. (Ibid.) Again there was no debate when the provision was read again and finally adopted by the convention. (3 Debates & Proceedings, Cal. Const. Convention 1878-1879, pp. 1188, 1425-1426, 1491, 1521.)[15]

We conclude, therefore, that article I, section 6 of the California Constitution, affords Brent no greater rights than does the Thirteenth Amendment

---

[15]The 1849 debate on a proposed measure to prohibit African-American immigration to California reflects both racism and a concern that slaves might be brought to California, where they would be free, on condition that they work as indentured servants in the gold fields. That would give their former owners a competitive advantage. (1849 Debates, supra, pp. 137-140; see also Johnson, Founding the Far West (1992) pp. 127-128.) There is some indication that the delegates then understood the indentured servant relationship to be prohibited as involuntary servitude. This may be implicit in the remarks of Delegate Dimmick who questioned whether a free man could be indentured and assumed that if an indentured minor were brought to the state he would be required to serve until age 21 when he would "undoubtedly" become free. (1849 Debates, supra, at p. 141.) Delegate Hastings expressed concern that African-Americans coming to this state might expect the broad principle that

to the federal Constitution. The California Constitution does not prohibit the imposition of contempt or criminal penalties on a parent who willfully refuses to seek employment when employment is necessary to enable the parent to support the parent's child or children.

## IV

### IMPRISONMENT FOR DEBT

██ Tamara also contends that the prohibition of imprisonment for debt found in article I, section 10 of the California Constitution (hereafter article I, section 10) does not support application of the *Todd* holding to child support obligations. We agree.

Article I, section 10 states in pertinent part: "A person may not be imprisoned in a civil action for debt or tort, or in peacetime for a militia fine."

It has long been settled that this provision does not apply to imprisonment for crime. "Imprisonment for debt, as such imprisonment is defined in our constitutional guaranties, is necessarily imprisonment in a civil action for debt. As such imprisonment existed in the English common law, it was a provisional remedy strictly analogous to the present-day remedy of attachment of goods. It is against such attachments that the constitutional guaranties against imprisonment for debt are directed. They have no application whatever to imprisonment for crime, and legislative bodies are free to provide for punishment by imprisonment of offenders who commit acts denominated by the said legislative bodies as offenses against the public, provided, of course, that other constitutional limitations are not violated." (*In re Nowak* (1921) 184 Cal. 701, 708-709 [195 P. 402].)

More recently, in *In re Trombley* (1948) 31 Cal.2d 801 [193 P.2d 734] (*Trombley*), this court considered the application of the prohibition of imprisonment for debt in what was then section 15 of article I of the California Constitution to Labor Code section 216, subdivision (a), which makes it a crime for an employer who has the ability to pay wages to employees to willfully refuse to do so. The Constitution then provided: "No person shall be imprisoned for debt in any civil action, on mesne or final process, unless

---

neither slavery nor involuntary servitude was allowed to mean what it said. (*Id.* at pp. 141-142.) Mr. Shannon, who had drafted and introduced what became section 18 of article I in the 1849 Constitution, pointed out that California had "forever excluded slavery. We have determined by the unanimous vote of this Convention that California shall not be a slave-holding State—that involuntary servitude shall not exist within its limits." (1849 Debates, *supra*, at p. 143.)

in cases of fraud, nor in civil actions for torts, except in cases of willful injury to person or property. . . ." (Cal. Const., art. I, former § 15.) We stated that while former section 15 expressly applied only to civil actions, we would examine any statute which makes nonpayment of an obligation a crime in light of the constitutional provision to ensure that the constitutional prohibition of imprisonment for debt is not circumvented by mere form. We then examined subdivision (a) of Labor Code section 216 to determine if the conduct it described came within the fraud exception.

"The word 'wilfully' as used in criminal statutes implies a purpose or willingness to commit the act (Pen. Code, § 7, subd. 1), and although it does not require an evil intent, it implies that the person knows what he is doing[,] intends to do what he is doing and is a free agent. [Citations.] Subdivision (a), construed together with the Penal Code definition of the word 'wilful,' makes it a crime for an employer having the ability to pay, knowingly and intentionally to refuse to pay wages which he knows are due." (31 Cal.2d at pp. 807-808.) We then considered whether this type of conduct could be punished by imprisonment and held that it could.

"The historical background of section 15 of article I and similar constitutional guaranties of other states clearly shows that the provisions were adopted to protect the poor but honest debtor who is unable to pay his debts, and were not intended to shield a dishonest man who takes an unconscionable advantage of another. (I Debates and Proceedings of the Constitutional Convention, 1878-1879, 265-268; Code Civ. Proc., § 715; *Gault* v. *Gault* [(1932)] 112 N.J.Eq. 41 [163 A. 139]; see *Clark* v. *State* [(1908)] 171 Ind. 104 [84 N.E. 984, 16 Ann.Cas. 1229].) It has long been recognized that wages are not ordinary debts, that they may be preferred over other claims, and that, because of the economic position of the average worker and, in particular, his dependence on wages for the necessities of life for himself and his family, it is essential to the public welfare that he receive his pay when it is due. [Citations.] An employer who knows that wages are due, has [the] ability to pay them, and still refuses to pay them, acts against good morals and fair dealing, and necessarily intentionally does an act which prejudices the rights of his employee. Such conduct amounts to a 'case of fraud' within the meaning of the exception to the constitutional prohibition and may be punished by statute." (31 Cal.2d at pp. 809-810.)

Article I, section 10 no longer includes an express fraud exception to its prohibition of imprisonment for debt. That change has no substantive effect on the scope of the prohibition, however, and the fraud exception is still recognized. (*People* v. *Bell* (1996) 45 Cal.App.4th 1030, 1043-1044 [53 Cal.Rptr.2d 156]; *Central Delta Water Agency* v. *State Water Resources*

*Control Bd.* (1993) 17 Cal.App.4th 621, 639 [21 Cal.Rptr.2d 453].) The obligation to pay child support, one which arises out of both statute and court order, is indistinguishable for purposes of the fraud exception to article I, section 10, from the obligation to pay wages.

Family support obligations are not ordinary debts subject to the constitutional prohibition of imprisonment for debt. (*Bradley* v. *Superior Court* (1957) 48 Cal.2d 509, 519 [310 P.2d 634] ["[A] court may . . . punish by imprisonment as a contempt the willful act of a spouse (or former spouse) who, having the ability and opportunity to comply, deliberately refuses to obey a valid order to pay alimony or an allowance for the support of the other spouse (or former other spouse). It is held that the obligation to make such payments is not a 'debt' within the meaning of the constitutional guaranty against imprisonment for debt. (*Miller* v. *Superior Court* (1937), *supra,* 9 Cal.2d 733, 737 [72 P.2d 868]; *Ex parte Spencer* (1890) 83 Cal. 460, 465 . . . ."]; see also *Ex parte Perkins* (1861) 18 Cal. 60, 64 ["The husband is bound to support the wife, yet this duty is an imperfect obligation which is not technically a debt."]; see also *In re Fontana* (1972) 24 Cal.App.3d 1008, 1010 [101 Cal.Rptr. 465]; *In re Hendricks* (1970) 5 Cal.App.3d 793, 796 [85 Cal.Rptr. 220].)

Even were the obligation considered a debt, however, the *Trombley* rationale would be applicable. Children are dependent on their parents for the necessities of life and it is essential to the public welfare that parents provide support with which to care for their needs. To paraphrase the *Trombley* court, a parent who knows that support is due, has the ability to earn money to pay that support, and still willfully refuses to seek and accept available employment to enable the parent to meet the support obligation acts against fundamental societal norms and fair dealing, and necessarily intentionally does an act which prejudices the rights of his children. This conduct would fall within the fraud exception to the constitutional prohibition of imprisonment for debt. (See also *People* v. *Neal C. Oester, Inc.* (1957) 154 Cal.App.2d Supp. 888, 891-892 [316 P.2d 784] [person who is willfully financially unable to comply with statutory obligation to pay over withheld taxes is within fraud exception].)

We conclude therefore, that neither the constitutional prohibition of involuntary servitude nor the bar to imprisonment for debt precludes imposition of a contempt or criminal sanction on a parent who, having the ability to do so, willfully fails to pay court-ordered child support, or when necessary to make payment possible willfully fails or refuses to seek and accept available employment for which the parent is suited by virtue of education, experience, and physical ability. To the extent that its application in the enforcement of child support obligations may be inconsistent with this conclusion, *Todd, supra,* 119 Cal. 57, is disapproved.

V

## LEGISLATIVE AUTHORIZATION

■ We also reject Brent's claim that express legislative authorization should be required before a contempt sanction is permitted in these circumstances. This claim needs little discussion. Express statutory authorization for both contempt sanctions and criminal penalties already exists for any willful violation of a court order. (Code Civ. Proc., § 1209 et seq.; Pen. Code, § 166, subd. (a)(4).) Inasmuch as the Legislature has expressly authorized the court to consider earning capacity in making a child support order if doing so is in the best interests of the child (Fam. Code, § 4058, subd. (b)), there can be no question but that the Legislature intends that that parental ability to work in order to support a child be considered in any enforcement action. We will not presume that the Legislature intended to leave the courts powerless to enforce orders expressly authorized by Family Code section 4058, subdivision (b). Rather, the presumption is that the Legislature is aware that violation of a court order is punishable as a contempt and intended that violation of an order made pursuant to Family Code section 4058, subdivision (b), be punished in the same manner as any other contempt based on violation of a court order.

In Family Code section 4505 the Legislature has also expressed a clear intent that parents who default on a child support obligation be compelled to seek employment when necessary to meet that obligation. That section permits "a court [to] require a parent who alleges that the parent's default in a child or family support order is due to the parent's unemployment to submit to the appropriate child support enforcement agency or any other entity designated by the court, including, but not limited to, the court itself, each two weeks, or at a frequency deemed appropriate by the court, a list of at least five different places the parent has applied for employment." (*Ibid.*) In addition, "a court may require either parent to attend job training, job placement and vocational rehabilitation, and work programs . . . in order to enable the court to make a finding that good faith attempts at job training and placement have been undertaken by the parent." (Fam. Code, § 3558.) A contempt penalty for violation of a child support order when inability to comply results from failure to seek and accept available employment consistent with the parent's abilities is, therefore, allowed by statute. No additional legislative action is needed to authorize the court to impose contempt sanctions.

Moreover, imposition of contempt or criminal sanctions for violation of a child support order is not limited to cases in which a parent's refusal to seek

or accept employment is for the purpose of disabling the parent from acquiring the ability to comply with parental support obligations. As we noted in *In re Marriage of Simpson* (1992) 4 Cal.4th 225, 233 [14 Cal.Rptr.2d 411, 841 P.2d 931], the statutory authority to consider earning capacity when fixing the amount a parent should be ordered to pay for the support of a child does not restrict the trial court's discretion in that manner.

While in *Simpson* it was unnecessary for the court to consider whether the court's authority to consider earning capacity was limited to cases in which a bad faith effort to avoid the parental obligation was established, the Court of Appeal has since done so and concluded that such a limitation would be contrary to public policy. "A parent's motivation for reducing available income is irrelevant when the ability and opportunity to adequately and reasonably provide for the child are present. [Citation.] [¶] Public policy supports our conclusion. Because children's interests are a top priority (Fam. Code, § 4053, subd. (a)) and payment of appropriate support is a parent's primary obligation (Fam. Code, § 4053, subds. (a) & (d)), a child support obligation ' "must be taken into account whenever an obligor wishes to pursue a different lifestyle or endeavor. . . . [C]hild . . . support [is] an overhead which must be paid first before any other expenses. . . . [A payor does] not have the right to divest himself [or herself] of his [or her] earning ability at the expense of . . . minor children." ' (*In re Marriage of Ilas* (1993) 12. Cal.App.4th 1630, 1635 [16 Cal.Rptr.2d 345]; see also *In re Marriage of Muldrow* (1976) 61 Cal.App.3d 327, 333 [132 Cal.Rptr. 48]; *Baron* v. *Baron* [(1970)] 9 Cal.App.3d 933 [88 Cal.Rptr. 404].)" (*In re Marriage of Padilla* (1995) 38 Cal.App.4th 1212, 1218 [45 Cal.Rptr.2d 555], fns. omitted.)

We agree with the *Padilla* court and thus decline to read into Family Code section 4058, subdivision (b), any limitation on the discretion vested in the trial court to consider earning capacity in determining the appropriate amount of child support when doing so would be in the child's best interests. That being so, a contempt sanction or criminal penalty may be imposed for violation of a support order that is based on earning capacity when inability to comply with the order is caused in whole or in part by the parent's willful failure to seek and accept employment.

## VI

### BURDEN OF PROOF

As noted earlier, Tamara took the position, and the trial court agreed, that inability to comply with a support order is an affirmative defense. The

trial court based its contempt judgment on evidence that the support order had been made, Brent had notice of the order, an inference that Brent must have had some income to meet those needs not met by his mother, and its observation that Brent had the ability to earn money to pay something toward his support obligation. Brent had argued that he needed only to raise the question of ability to comply in order to shift to Tamara the burden of presenting evidence sufficient to prove beyond a reasonable doubt that he had the present financial ability to comply with the order.

Brent's argument reflects a basic misunderstanding of the allocation of burden in support proceedings. Ability to comply with a support order is not an element of the contempt which must be proven beyond a reasonable doubt by the petitioner. Inability to comply is an affirmative defense which must be proven by a preponderance of the evidence by the alleged contemner.

We observe initially that assigning the burden to prove an affirmative defense by a preponderance of the evidence to a defendant in a criminal proceeding, and thus to an alleged contemner in a criminal contempt proceeding, is constitutionally permissible. The Supreme Court so held in *Martin* v. *Ohio* (1987) 480 U.S. 228 [107 S.Ct. 1098, 94 L.Ed.2d 267], when it considered the validity under the due process clause of the Fourteenth Amendment of an Ohio statute pursuant to which self-defense was an affirmative defense in a prosecution for murder. Affirmative defenses under Ohio law were those in which " 'an excuse or justification [was] peculiarly within the knowledge of the accused, on which he can fairly be required to adduce supporting evidence.' " (480 U.S. at p. 230 [107 S.Ct. at p. 1100].) The high court held that since the state did not preclude the jury from considering self-defense evidence in determining whether there was a reasonable doubt that any element of the offense had been proven, it was permissible to impose on the defendant the burden of proving self-defense by a preponderance of the evidence. (*Id.* at pp. 233-234 [107 S.Ct. at p. 1102]; see also *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 963-965 [127 Cal.Rptr. 135, 544 P.2d 1335].)

The rule applied by the high court was consistent with the court's earlier decision in *Patterson* v. *New York* (1977) 432 U.S. 197 [97 S.Ct. 2319, 53 L.Ed.2d 281]. There the court considered a New York law that placed the burden on a murder defendant to prove an affirmative defense of extreme emotional disturbance by a preponderance of the evidence in order to reduce the offense to manslaughter. The court emphasized, as it did again in *Martin* v. *Ohio, supra,* 480 U.S. at page 232 [107 S.Ct. at page 1101], that defining the elements of an offense and the procedures, including the burdens of producing evidence and of persuasion, are matters committed to the state. A

state's decision in that regard does not offend the due process clause "unless 'it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " (*Patterson* v. *New York, supra*, 432 U.S. at p. 202 [97 S.Ct. at p. 2322].) Thus the state may not label as an affirmative defense a traditional element of an offense and thereby make a defendant presumptively guilty of that offense unless the defendant disproves the existence of the element. (*Id.* at pp. 210, 211, fn. 13 [97 S.Ct. at p. 2327]; see also *Mullaney* v. *Wilbur* (1975) 421 U.S. 684 [95 S.Ct. 1881, 44 L.Ed.2d 508].) Due process does not require that the state prove the nonexistence of a constitutionally permissible affirmative defense, however. (432 U.S. at p. 210 [97 S.Ct. at p. 2327].)

The California Legislature has made inability to pay—which encompasses both present financial inability and inability to obtain remunerative employment in order to pay—an affirmative defense. Proof of ability to pay is not an element of a contempt based on a failure to comply with a child support order. Code of Civil Procedure section 1209.5 makes this allocation of the burden: "When a court of competent jurisdiction makes an order compelling a parent to furnish support or necessary food, clothing, shelter, medical attendance, or other remedial care for his or her child, proof that the order was made, filed, and served on the parent or proof that the parent was present in court at the time the order was pronounced and proof that the parent did not comply with the order is prima facie evidence of a contempt of court." The United States Supreme Court has confirmed that whether ability to comply is to be an element of the contempt or an affirmative defense, and whether Code of Civil Procedure section 1209.5 shifts the burden of persuasion or simply imposes a burden of producing some evidence showing inability to comply are questions of state law. (*Hicks* v. *Feiock* (1988) 485 U.S. 624, 629 [108 S.Ct. 1423, 1428, 99 L.Ed.2d 721].)

As the Court of Appeal explained on remand of the *Feiock* matter from the Supreme Court, ability to pay has traditionally been considered an affirmative defense in contempt proceedings.

"For many years in California ability to pay has been considered, without much analysis, to be a matter of defense in contempt proceedings. (*Lyon* v. *Superior Court* (1968) 68 Cal.2d 446, 451 [67 Cal.Rptr. 265, 439 P.2d 1]; *In re McCarty* (1908) 154 Cal. 534, 537 [98 P. 540]; *Galland* v. *Galland* (1872) 44 Cal. 475, 478 ; *Lyons* v. *Municipal Court* (1977) 75 Cal.App.3d 829, 838 [142 Cal.Rptr. 449]; *Martin* v. *Superior Court* [(1971]) 17 Cal.App.3d 412, 417 [95 Cal.Rptr. 110]; *Sorell* v. *Superior Court* (1967) 248 Cal.App.2d 157, 161 [56 Cal.Rptr. 222]; . . .)

"This approach is consistent with legislative intent, constitutional law, and common sense. When this case was first before this court, the parties and the

court all assumed that [Code of Civil Procedure] section 1209.5 dealt with an evidentiary presumption. It does not.

"The section was enacted in response to *Warner* v. *Superior Court* [(1954)] 126 Cal.App.2d 821 [273 P.2d 89]. (Rev. of 1955 Code Legislation (U. of Cal. Ext., 1955) p. 129.) *Warner* held that ability to pay was an element of contempt which had to be alleged in the affidavit and proved by the petitioner in contempt proceedings. The Legislature's purpose in enacting the section was to nullify *Warner* insofar as it made ability to pay an element.

"The language of the statute strongly suggests this is true. Rather than say that 'ability to pay' shall be presumed from proof of the basic facts, the section states that proof of the order, knowledge of it, and noncompliance 'shall be prima facie evidence of a contempt of court.' ([Code Civ. Proc.,] § 1209.5.) In other words, proof of these basic facts proves the entire contempt. Once the contempt is proved any excuse or justification, such as ability to pay, is a matter of defense. We must adhere to this plain meaning of the statute." (*In re Feiock* (1989) 215 Cal.App.3d 141, 146-147 [263 Cal.Rptr. 437], fns. omitted.)

We agree with the *Feiock* court's further observation that this allocation of the burden in a child support contempt proceeding is reasonable.

The Legislature's decision that ability to comply should not be an element of a child support contempt offense, and to permit the contemner to escape punishment if inability is established, reflects a policy like those underlying the rule of convenience made applicable to many defenses that are dependent on information or evidence accessible to or in the control of the defendant. (See generally, 1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 149 et seq., p. 129 et seq.) As the court recognized in *Feiock*: "The contemner is the person in the best position to know whether inability to pay is even a consideration in the proceeding and also has the best access to evidence on the issue, particularly in cases of self-employment. Considerations of policy and convenience have led courts to sanction placement of the burden of establishing a defense on defendants under similar circumstances. (*People* v. *Babbitt* [(1988)] 45 Cal.3d 660, 693 [248 Cal.Rptr. 69, 755 P.2d 253] [unconsciousness]; *People* v. *Vogel* (1956) 46 Cal.2d 798, 803 [299 P.2d 850] [good faith marriage in bigamy prosecution]; *People* v. *Wells* (1938) 10 Cal.2d 610, 617 [76 P.2d 493] [mitigation in homicide prosecution]; *People* v. *Yoshimura* (1979) 91 Cal.App.3d 609, 626 [154 Cal.Rptr. 314] [permit for otherwise unlawful articles]; *People* v. *Condley* (1977) 69 Cal.App.3d 999, 1013 [138 Cal.Rptr. 515] [escape due to

necessity].)" (*In re Feiock, supra,* 215 Cal.App.3d at pp. 147-148, fn. omitted.)

Although the *Feiock* court correctly recognized that ability to pay is not an element of the contempt offense, it went on to state that the alleged contemner need only raise the issue of ability to pay and that the petitioner must then prove the contempt beyond a reasonable doubt, including ability to pay. (*In re Feiock, supra,* 215 Cal.App.3d at p. 148.) Because ability to pay is not an element of the child support contempt offense, we do not agree and disapprove *In re Feiock, supra,* 215 Cal.App.3d 141, in that respect. As the court had earlier acknowledged, the elements of this contempt are only a valid court order, the alleged contemner's knowledge of the order, and noncompliance. If the petitioner proves those elements beyond a reasonable doubt the violation is established. He or she need go no farther. To prevail on the affirmative defense of inability to comply with the support order, the contemner must prove such inability by a preponderance of the evidence.

We see no constitutional impediment to the Legislature's creation of a contempt offense for failure to support a child in which ability to pay is not an element. The ability of the parent to pay the amount of support ordered has been determined by the court that made the order. (Fam. Code, § 4050 et seq.) The nonsupporting parent has been given the opportunity to offer evidence on the question and to challenge the order in the appellate court. He or she is also afforded the opportunity to seek modification of the order if circumstances change making compliance difficult or impossible. (Fam. Code, §§ 3651, 3680, 4010.) The contempt penalty for failure to comply with the support order is limited to five days in jail and a $1,000 fine for each monthly payment that is not made in full. (Code Civ. Proc., §§ 1218, 1218.5.) The offense is comparable to a "strict liability" regulatory or "public welfare" offense in this regard (see *People* v. *Chevron Chemical Co.* (1983) 143 Cal.App.3d 50, 52-54 [191 Cal.Rptr. 537]), but unlike some regulatory offenses, the contemner may escape liability by establishing an affirmative defense. Under these circumstances the omission of an element of willfulness does not offend due process. (Cf. *Lambert* v. *California* (1957) 355 U.S. 225, 228 [78 S.Ct. 240, 242-243, 2 L.Ed.2d 228].)

## VII

### DISPOSITION

Nonetheless, the judgment of the Court of Appeal must be affirmed. Our disapproval of *Todd* insofar as it might apply to child support orders, and of *In re Feiock* insofar as that decision placed the burden on a petitioner

to prove that a nonsupporting parent had the ability to pay may reasonably be seen as both an unanticipated expansion of the law of contempt in the child support context and a change in the evidentiary burden of which Brent had no notice at the time of trial. Neither rule may be retroactively applied therefore.

While we sympathize with Justice Kennard's preference for upholding the contempt order in this case, due process concerns preclude adoption of the course she proposes. It is true that *Todd* dealt with a spousal support order. Nonetheless no basis for distinguishing child support orders was apparent at the time *Todd* was decided, and the Court of Appeal in this case believed *Todd* to be controlling and there was no contrary authority from which we could imply that Brent knew otherwise. We are unwilling to assume as Justice Kennard does that because the Legislature has authorized a court to require nonsupporting parents to demonstrate that efforts have been made to find employment, Brent should have known in advance of our decision today, and in a case in which no such order was made, that *Todd* was inapplicable and that a court does have the authority to hold a nonsupporting parent whose inability to comply with a child support order in contempt because the parent failed to seek employment.[16] The effect would be to make conduct that was not subject to criminal contempt sanctions at the time it was committed contemptuous. This we may not do.

Moreover, Brent reasonably relied on *In re Feiock*, which we disapprove in part only today, for his belief that having raised the issue of inability to pay the burden shifted to Tamara to prove that he could have obtained employment in order to comply with the support order.

Due process precludes retroactive application of either rule. Like retroactive application of an "unforeseeable and retroactive judicial expansion of" a statute (*Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 352 [84 S.Ct. 1697, 1702, 12 L.Ed.2d 894]), retroactive application of a decision disapproving prior authority on which a person may reasonably rely in determining what conduct will subject the person to penalties, denies due process. Brent could reasonably have relied on *Todd* for a belief that he could not be compelled to find work in order to make it possible to comply with the child support order. Upholding the contempt sanction here would also have the effect of

---

[16]We note also the lack of evidence that Brent could have obtained employment. While the trial court found that he had the ability to work and opined that he could have found some employment such as flipping hamburgers we do not deem either employment availability or a person's qualifications for a particular type of employment to be matters subject to judicial notice. Under the rules in place at the time of this proceeding, the evidence was not sufficient to establish ability to comply with the court order on the theory that Brent could have found employment in order to do so.

depriving Brent of an affirmative defense available at the time of the alleged contempt by adding another element—inability to find employment—thereby expanding the scope of the contempt after its commission. (*Collins v. Youngblood* (1990) 497 U.S. 37, 49 [110 S.Ct. 2715, 2722, 111 L.Ed.2d 30].) This, too, would be forbidden by the ex post facto clause and thus denies due process if accomplished by retroactive application of a new judicial decision.

Moreover, our partial disapproval of *In re Feiock* imposes on the alleged contemner the burden of proof of inability to pay. Under *In re Feiock*, an alleged contemner was only required to offer sufficient evidence to raise the issue of inability to pay. He did not have to prove inability to pay or to find employment in order to do so. The affirmative defense was established once the issue of ability to pay was raised unless the petitioner proved ability to pay. Due process also precludes retroactive application of such a rule. It may be constitutionally permissible to alter the rules of evidence and burdens of proof after the commission of an offense. (See *Collins v. Youngblood, supra,* 497 U.S. at p. 43, fn. 3 [110 S.Ct. at pp. 2719-2720].) However, to state a new rule on appeal after trial by holding that a defendant has a burden of proof on the ability-to-pay element of the affirmative defense and to apply the new rule retroactively to a trial at which the defendant did not have notice of the change is not permissible.

The judgment of the Court of Appeal is affirmed.

George, C. J., Mosk, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the majority opinion except as to the disposition. The majority holds, and I agree, that a parent may not avoid criminal contempt sanctions for violating a child support order by asserting the defense of financial inability to comply with the order if that inability results from the parent's unexcused failure to seek or accept suitable employment. (Maj. opn., *ante,* at p. 401.) But the majority declines to apply this holding to Brent Moss, the alleged contemner in this case, stating that the decision "may reasonably be seen as both an unanticipated expansion of the law of contempt in the child support context and a change in the evidentiary burden of which Brent had no notice at the time of trial" (*id.* at p. 429), and that for this reason "[n]either rule may be retroactively applied" (*ibid.*). I disagree.

The majority invokes the rule that a criminal conviction may not be based upon "an unforeseeable judicial enlargement of a criminal statute." (*Bouie v. City of Columbia* (1964) 378 U.S. 347, 353 [84 S.Ct. 1697, 1702, 12 L.Ed.2d 894] (*Bouie*).) Just as the ex post facto provisions of the federal and state

Constitutions prohibit the legislative branch from enacting laws that impose criminal penalties for past conduct (U.S. Const., art. I, §§ 9, 10; Cal. Const., art. I, § 9), so also the constitutional due process guarantees (U.S. Const., 5th and 14th Amends.; Cal. Const., art. I, § 7) prohibit the judicial branch from imposing unexpected criminal penalties by construing existing laws in a manner that the accused could not have foreseen at the time of the alleged criminal conduct. (*Marks* v. *United States* (1977) 430 U.S. 188, 191-192 [97 S.Ct. 990, 993, 51 L.Ed.2d 260].) A court violates this due process "fair warning requirement" when it applies "a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." (*United States* v. *Lanier* (1997) 520 U.S. 259, __ [117 S.Ct. 1219, 1225, 137 L.Ed.2d 432].)

Here, as the majority acknowledges (maj. opn., *ante*, at pp. 423-424), the relevant statutes provide the fair warning that due process requires. Under Code of Civil Procedure section 1209, subdivision (a)5, disobedience of any lawful court order, including a child support order, is punishable by contempt. Under Code of Civil Procedure sections 1218 and 1218.5, when the contempt consists of a failure to pay spousal support, each month for which payment is not made may be treated as a separate count of contempt, and each of these counts is punishable by, among other things, up to five days' imprisonment. Under Code of Civil Procedure section 1209.5, the elements of contempt for failing to pay child support are the making of the child support order by a court of competent jurisdiction, notice to the parent that the order was made, and the parent's noncompliance with the order. The parent's ability to comply with the support order is not an element of the contempt, although the parent may assert inability to comply as an affirmative defense. (Maj. opn., *ante*, at p. 426; *In re Feiock* (1989) 215 Cal.App.3d 141, 146-148 [263 Cal.Rptr. 437] (*Feiock*).)

At the times relevant here, the statutory scheme provided parents with fair notice that the affirmative defense of inability to comply could not be based on a lack of income resulting from the parent's unexcused failure to seek and accept available employment. As the majority states: "In Family Code section 4505 the Legislature has also expressed a clear intent that parents who default on a child support obligation be compelled to seek employment when necessary to meet that obligation. That section permits 'a court [to] require a parent who alleges that the parent's default in a child or family support order is due to the parent's unemployment to submit to the appropriate child support enforcement agency or any other entity designated by the court, including, but not limited to, the court itself, each two weeks, or at a frequency deemed appropriate by the court, a list of at least five different places the parent has applied for employment.' (*Ibid.*) In addition 'a court

may require either parent to attend job training, job placement and vocational rehabilitation, and work programs . . . in order to enable the court to make a finding that good faith attempts at job training and placement have been undertaken by the parent.' (Fam. Code, § 3558.) A contempt penalty for violation of a child support order when inability to comply results from failure to seek and accept available employment consistent with the parent's abilities is, therefore, allowed by statute." (Maj. opn., *ante*, at p. 423; see also, *In re Marriage of Simpson* (1992) 4 Cal.4th 225, 232 [14 Cal.Rptr.2d 411, 841 P.2d 931].)

Although it acknowledges that the relevant statutes provide fair warning that a parent who does not seek or accept suitable employment may not establish inability to pay as an affirmative defense in a contempt proceeding for violation of a child support order, the majority concludes that this statutory warning was somehow neutralized or vitiated by *Ex parte Todd* (1897) 119 Cal. 57 [50 P. 1071] (*Todd*) and, by implication, *In re Jennings* (1982) 133 Cal.App.3d 373 [184 Cal.Rptr. 53] and *In re Brown* (1955) 136 Cal.App.2d 40 [288 P.2d 27]. But these decisions are not controlling because they involved orders for spousal support, not child support. Indeed, the majority declines to overrule *Todd* because it is distinguishable on this basis. (Maj. opn., *ante*, at p. 405, fn. 4.) Because this court's 100-year-old decision in *Todd* "offered no explanation for its holding" (*ibid.*), it was not certain that the holding would apply in the separate arena of child support orders. In short, our holding in this case does not constitute an unexpected or unforeseeable repudiation of controlling judicial precedent (cf., e.g., *Marks* v. *United States, supra,* 430 U.S. 188, 195 [97 S.Ct. 990, 994]; *People* v. *Davis* (1994) 7 Cal.4th 797, 812 [30 Cal.Rptr.2d 50, 872 P.2d 591]).

"Not all judicial interpretations of statutes having a retroactive effect are prohibited" (*People* v. *Wharton* (1991) 53 Cal.3d 522, 586 [280 Cal.Rptr. 631, 809 P.2d 290]), nor is retroactive application barred merely because the state of the law was ambiguous or uncertain. This point is illustrated by this court's decisions addressing whether intent to kill is an element of the felony-murder special circumstance under Penal Code section 190.2. In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (*Carlos*), this court recognized that Penal Code section 190.2 did not specify that intent to kill was required, but we concluded, by a margin of six to one, that implying such a requirement was necessary to render our death penalty law consistent with the reasoning of *Enmund* v. *Florida* (1982) 458 U.S. 782 [102 S.Ct. 3368, 73 L.Ed.2d 1140] (*Enmund*) and other decisions of the United States Supreme Court.

In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] (*Anderson*), this court overruled *Carlos, supra,* 35 Cal.3d 131. We

acknowledged that, when this court decided *Carlos*, the decisions of the United States Supreme Court, particularly *Enmund, supra,* 458 U.S. 782, appeared to support the proposition that the death penalty could be imposed only for intentional killings. (*Anderson, supra,* at pp. 1139-1140.) One of the high court's later decisions, however, had "made it plain that we had read *Enmund* more broadly than it had intended." (*Anderson, supra,* at p. 1140.) Reconsidering the question, this court concluded that, as applied to an actual killer, the felony-murder special circumstance does not require intent to kill. (*Id.* at p. 1147.)

This court decided the retroactivity of this latter holding in *People* v. *Poggi* (1988) 45 Cal.3d 306 [246 Cal.Rptr. 886, 753 P.2d 1082] (*Poggi*). Like the majority here, the defendant in *Poggi* relied upon *Bouie, supra,* 378 U.S. 347, for the proposition that an unforeseeable construction of a criminal statute may not be applied retroactively. Rejecting the argument, this court said: "No such unforeseeability existed here. Defendant stands convicted of a murder that preceded *Carlos*[, *supra,* 35 Cal.3d 131]. *Carlos* itself concluded that the statute was ambiguous with respect to the requirement of intent to kill for a felony-murder special circumstance. (See . . . *Anderson, supra,* 43 Cal.3d at p. 1143.) There was ample basis for pre-*Carlos* foreseeability of a holding that such intent is not required for the actual killer. (. . . *Anderson, supra,* 43 Cal.3d at pp. 1138-1147.)" (*Poggi, supra,* 45 Cal.3d 306, 327.)[1]

So also here. The statutory scheme gave parents like Brent, the alleged contemner, ample warning that a court could impose contempt sanctions for a parent's unexcused failure to obtain suitable employment necessary to comply with a child support order. Although Brent "could reasonably have relied on *Todd*[, *supra,* 119 Cal. 57]" (maj. opn., *ante,* at p. 429) as lending plausible support to a belief that a parent's unexcused failure to obtain work was not punishable by contempt, it is no less true that the defendant in *Poggi, supra,* 45 Cal.3d 306, "could reasonably have relied on" *Enmund, supra,* 458 U.S. 782, as lending plausible support to a belief that an unintentional killing during the commission a felony was not punishable by death. But in neither situation is it sufficient that a noncontrolling judicial decision supported a plausible belief that a particular criminal sanction could not be imposed for particular conduct. Retroactive application of a judicial construction of a penal law is not barred merely because the prior status of the law was uncertain. Rather, "the touchstone is whether the statute, either

---

[1]Because *Carlos, supra,* 35 Cal.3d 131, was itself controlling authority, this court has held that *Anderson, supra,* 43 Cal.3d 1104, may not be applied retroactively to conduct occurring after *Carlos* but before *Anderson*. (*People* v. *Duncan* (1991) 53 Cal.3d 955, 973, fn. 4 [281 Cal.Rptr. 273, 810 P.2d 131].)

standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." (*United States* v. *Lanier, supra,* 520 U.S. 259, __ [117 S.Ct. 1219, 1225].) Because the statutory scheme at issue here gave parents ample warning that unexcused failure to take suitable employment could result in criminal contempt sanctions, and because that statutory scheme had never been authoritatively construed to preclude imposition of contempt for this conduct, applying this statutory scheme to Brent does not violate the due process fair warning requirement. I would apply it.

The majority also declines to apply in this case its holding that a parent relying on the defense of inability to pay has the burden of proving that defense by a preponderance of the evidence. As the majority points out, Brent may have relied upon a Court of Appeal decision stating that the alleged contemner's burden was "merely to raise the issue of his ability to pay" (*Feiock, supra,* 215 Cal.App.3d 141, 148). The majority disapproves this aspect of *Feiock.*

Because the ex post facto and due process provisions of the federal Constitution forbid retroactive application of a change in the law that lessens the prosecution's burden of proof (see *Dobbert* v. *Florida* (1977) 432 U.S. 282, 293 [97 S.Ct. 2290, 2298, 53 L.Ed.2d 344]; *Hopt* v. *Utah* (1884) 110 U.S. 574, 589 [4 S.Ct. 202, 209-210, 28 L.Ed. 262]), it is reasonable to assume they equally forbid retroactive application of a change in the law that increases a defense burden of proof. Thus, I agree that our holding respecting burden of proof may not be applied retroactively to this case. But I do not agree that Brent, the alleged contemner here, is entitled to prevail under the former burden of proof allocation.

Brent failed to discharge even the slight burden of proof imposed by *Feiock, supra,* 215 Cal.App.3d 141. Under that decision, he was required to "raise the issue of his ability to pay." (*Id.* at p. 148.) To raise the issue, he had to do more than just announce in court that he was relying on the defense of inability to pay. Rather, he had to "offer evidence . . . sufficient to raise a reasonable doubt" (*People* v. *Simon* (1995) 9 Cal.4th 493, 506 [37 Cal.Rptr.2d 278, 886 P.2d 1271]) as to " 'the existence or nonexistence of the fact in issue' " (*People* v. *Figueroa* (1986) 41 Cal.3d 714, 721 [224 Cal.Rptr. 719, 715 P.2d 680]). Stated otherwise, he needed to supply evidence deserving of consideration in the sense that it was evidence from which a reasonable person could have resolved the issue of inability to comply in his favor. (See *People* v. *Barrick* (1982) 33 Cal.3d 115, 132 [187 Cal.Rptr. 716, 654 P.2d 1243].)

Brent's showing at the contempt hearing failed to meet even this low threshold. To raise the defense of inability to pay, Brent needed to offer

evidence from which a reasonable person could have concluded not only that Brent lacked sufficient income to make his court-ordered child support payments but also either that he had made reasonable and good faith efforts to obtain employment or that such efforts would have been unavailing. Brent offered no such evidence; therefore, he did not raise the defense of inability to comply.

For these reasons, I would reverse the judgment of the Court of Appeal and direct that court to affirm the trial court's judgment imposing contempt sanctions.

Petitioner's application for a rehearing was denied March 25, 1998.