[Civ. No. 3516. Fourth Dist. Feb. 27, 1947.]

KEE COLEMAN et al., Appellants, v. JOHN GALVIN, Respondent.

Earl C. Berger for Appellants.

Ray W. Hays and J. Frank Murphy for Respondent.

GRIFFIN, J.—Plaintiffs and appellants recovered a judgment against defendant and respondent in Santa Clara County for $20,000 as a result of an automobile accident. The insurance carrier paid $11,952.74 upon the judgment. An abstract of judgment, for the balance remaining due, was filed on May 2d, 1945, in Fresno County. On September 26, 1945, an order was made requiring the judgment debtor to appear for examination, on supplemental proceedings. The affidavit in support of the order recited that the judgment debtor now resides in Fresno County and that about $8,000 was still due upon the judgment; that he was employed by the Diocese of Monterey-Fresno of the Roman Catholic Church, and that their office, records and officers were also located in that county; that property belonging to the judgment debtor might be located therein which is subject to execution. It was ordered that the Monsignor John Galvin, His Excellency Philip Scher, the bishop, and the Right Reverend James H. Culleton, the chancellor-secretary of the Diocese of Monterey-Fresno appear and answer all questions pertaining to the judgment debtor's property and bring with them all records pertaining to same and also all automobile insurance policies and records of transactions involving assignments of property by the judgment debtor to the bishop or other persons or institutions subject to their control. A subpoena duces tecum was ordered for such purpose.

At the hearing, on October 17, 1945, the defendant, the judgment debtor, was sworn. The original automobile insurance policy, covering defendant's car, was produced and received in evidence. Before any question was propounded of the witness, his counsel stated that he had instructed the judgment debtor "to refuse to answer any questions in response to the interrogatories taken under supplemental proceedings on the ground that any of his answers might have a tendency to incriminate himself," and cited section 154 of the Penal Code; *Ex parte Clarke*, 103 Cal. 352 [37 P. 230]; and *In re Berman*, 105 Cal.App. 37 [287 P. 126].

Counsel for plaintiffs suggested that he first be allowed to ask some questions of the witness before the court ruled. After some argument the court agreed. Several questions followed.

Counsel for defendant then objected on the same ground "as originally made" and the trial court sustained objections to all previous questions bearing on the subject. The witness was then separately asked certain questions hereinafter set out in full in respect to his property. After counsel again admonished his client that he need not answer the questions propounded on the ground that they might incriminate him, the trial court asked the witness: "You refuse to answer, do you? An affirmative answer followed and the court again sustained the objection. Counsel for plaintiffs then explained the reason for his questions and stated that he had in his possession a deed indicating that Father Galvin owned an interest in certain real property in Los Angeles, and described it. Counsel for defendant then again instructed his client to refuse to answer on the constitutional grounds and the trial court again sustained the objection. Defendant was then asked if he (Father Galvin) was employed and the court sustained the objection on the ground that "it may tend to incriminate him" after which counsel for plaintiffs addressed the court and said: ". . . to clear the record . . . I would ask the same questions to cover the property from the date of entry of judgment, October 1, 1943 until the present time. My last line of questions were limited on their face to today, October 17, 1945. Now, if I would ask the same questions relating back to the period October 1st and to include the period October 1, 1943 until today, Mr. Murphey, would your objections be the same? . . . MR. MURPHEY: I believe they would. MR. BERGER: And I take it, Your Honor—— THE COURT: The ruling would be the same. MR. BERGER: . . . I do not want that lack of knowledge to work against the rights that my two clients might have, and therefore I am going to ask your Honor to suggest to me what I might do in order to have this witness answer questions pertaining to such assets as may be used to pay the judgment. THE COURT: Well, the Court won't instruct counsel as to how to handle his case. . . . MR. BERGER: Well, then, I must admit that I am at a loss to understand how the judgment-debtor can be examined and be required to pay a judgment that remains unpaid. And that being the case, why it is perfectly futile to try to proceed and ask any further questions here. I am through with this witness at the present time because of the Court's rulings."

The chancellor-secretary was then called as a witness. He testified that defendant was not exactly "employed" by the

corporation; that he is a priest—"a part of the corporation"; that he receives no compensation for his duties; that he has his living from the church, i. e. "honesta sustenata," a place to sleep, some clothes, his food and reasonable diversion, totaling about $1,000 a year; that the books of the corporation show he has not taken more than that from the church and that it has no monies or other personal property belonging to Father Galvin. He was then asked if the church did not have a blanket policy which applied to automobile accidents in which priests might be involved as drivers. He replied that the blanket policy held by it only covered judgments rendered against the church; that if the court would instruct the reporter not to write anything down he would answer the question; that in his "humble opinion" the policy would not cover Father Galvin's accident. He was then called upon to produce the policy described. He replied that if he had the policy he would bring it, and he could find out what company wrote it, if ordered to do so by the court. A recess was then taken and the witness was to phone his insurance agent for the information. No further questions were asked of him. Counsel for plaintiff then renewed his request to reexamine the judgment debtor further and offered to submit further authorities to the trial court in support of his contention that the defendant should have been allowed and compelled to answer the questions propounded as to whether he now has any assets subject to execution. The court then informed counsel for plaintiffs that he had his "remedy by appeal," if any, denied his motion, and terminated the proceedings. From this order plaintiff appealed.

The respondent, on this appeal, for the first time challenges the jurisdiction of the Superior Court of Fresno County to issue an order for the examination of the judgment debtor because it is based upon a judgment obtained in Santa Clara County. He cites *Corcoran* v. *Harris*, 94 Cal.App. 19 [270 P. 391], decided September 14, 1928. This case does hold that under the law as it then existed, and where no abstract of judgment was filed in the latter county, the order for examination must issue out of the county in which the judgment was entered, and if the judgment debtor resides in another county that court should appoint a referee and hear the matter in the county of the debtor's residence.

In 1929 (Stats. 1929, p. 847), one year after the date of the decision relied upon by respondent, section 722 of the Code of

Civil Procedure was enacted, which section now provides that when any judgment debtor does not reside or have a place of business, in the county where the judgment roll is filed, an order authorized to be made under any provisions of this chapter (Pt. 2, tit. 9, Ch. 2), (and this is such an order), (See Code Civ. Proc., §§ 714-716), may be made by any judge of a court of similar jurisdiction of the county where such judgment debtor resides or has a place of residence (Fresno County is the county in which the judgment debtor resides and has his place of business), upon the filing with the clerk of an abstract of the judgment in the form prescribed by section 674, Code of Civil Procedure (such a form of abstract was so filed), and upon presenting to the judge an affidavit showing the existence of the facts required to be shown herein (such an affidavit was so filed).

It clearly appears from the record that the Superior Court of Fresno County had jurisdiction to hear such proceedings, i. e., the examination of a judgment debtor relating to his property generally. ■ The proceeding is intended to be summary and factual. It affords the widest scope for inquiry concerning the property and business affairs of the judgment debtor. No formal issues are framed, for the very object of the proceedings is to compel him to give information concerning his property. It has been stated that the examination of a debtor who has property which he refuses to apply toward the judgment covers the same field as is had for precisely the same purpose, to wit: of having disclosed, by an examination of the debtor, some property not exempt from execution which the judgment creditor may have subjected to sale under his execution. ■ A third person or corporation alleged to have property of a judgment debtor or to be indebted to him may be examined concerning the same. (Code Civ.Proc. § 717; 11 Cal.Jur. p. 152, § 87; *People ex rel. Dorris* v. *McKamy,* 28 Cal.App. 196 [151 P. 743]; *McCullough* v. *Clark,* 41 Cal. 298; *Watson* v. *Pryor,* 49 Cal.App. 554 [193 P.797].)

■ Counsel for plaintiffs first complains that the trial court should have ordered the witness Culleton to produce his books, records and policies of insurance belonging to the church. We see no merit to this claimed error of the trial court because the witness testified fully in respect to the same and made an offer to call the insurance agent and ascertain additional information for the benefit of the plaintiffs. From

the record it would appear that plaintiffs were satisfied with the information received and that the records or books would not disclose any further evidence valuable to him. At any rate, counsel for plaintiffs made no further request for an order in connection with the production of any other books, records or policies, and he should therefore not be heard to complain in this respect.

■ He next argues that the bishop was subpoenaed to appear at such hearing and that apparently the trial court, through some outside information, waived the requirement that this witness appear at the hearing and that the trial court did not consult with counsel for plaintiffs about such waiver. The trial judge told counsel, for the first time, at the hearing, that he had been informed that the bishop knew nothing about the property of the defendant Galvin or the books or records of the church and that therefore he was not present at the hearing. While it might appear that counsel for plaintiffs should have been apprised of the action about to be taken as to the apparent waiver of the presence of the witness thus subpoenaed, it does not appear from the record that he made any further request for an order requiring his attendance or for an order of contempt. On this appeal he cannot be heard to complain in this respect. (Code Civ.Proc. § 1209, subd. 9; Code Civ.Proc. § 1211; *Drew* v. *Superior Court of Mendocino Co.*, 180 Cal. 711 [182 P. 417].)

■ The third point presented is more meritorious and deserving of consideration. It might appear that the trial court was led into error in reference to its rulings on some of the questions propounded to defendant, from the statement of counsel for defendant. Mr. Murphy, counsel for defendant, in his remarks to the court, said: *"In re Berman . . ."* holds "that it is the witness's province to state whether he believes the question would incriminate himself, that must in the nature of the case be his decision to make, because the court cannot know what his inference is in the matter; so he is the one to make the decision in the matter." We do not believe that the case cited goes this far, for if it did, any judgment debtor could claim such privilege and could never be compelled to testify as to his property holdings.

In *In re Berman, supra,* the petitioner had given a deposition and had answered certain specified questions in a certain manner. By way of impeachment, as a witness on a supplementary hearing, he was asked if the answers given in the

deposition were "not a true statement of fact." In each case the witness declared his wish to stand upon his constitutional rights and refuse to answer on the ground that it might tend to incriminate him. One could readily understand, under these circumstances, why he might elect to refuse to answer the questions as propounded for the reason that they might, if answered contrary to his previous statement, tend to convict himself of perjury. It was under these circumstances that the court there held that the witness could not be compelled to answer the questions.

In *Ex parte Clarke, supra,* relied upon by defendant, the petitioner had been adjudicated an insolvent debtor. His assignee in insolvency filed a petition charging him with having concealed and disposed of property which should have been turned over to the assignee for the benefit of creditors. It was in that same insolvency proceeding he was ordered to appear and be examined upon the matters alleged. It was there held that he could not be made to answer the questions. It is apparent that a disclosure that he did conceal part of his property and not declare it in the insolvency proceeding might subject him to prosecution under section 154 of the Penal Code.

Section 154 of the Penal Code does provide that "Every debtor who fraudulently removes his property or effects out of this state or fraudulently sells, conveys, assigns or conceals his property with intent to defraud, hinder or delay his creditors of their rights, claims or demands, is punishable by imprisonment in the county jail. . . ."

The general rule, taken from the several cases bearing on the question, is discussed in *In re Berman, supra,* and it is there said;

". . . that the witness cannot arbitrarily refuse to testify without the existence in fact of a *real danger,* and that some discretion must rest in the court whereby it may prevent the mantle of protection from being turned into a cloak for fraud and trickery." (Italics ours.)

Justice Marshall's decision in the case of *United States* v. *Burr* (*In re Willie*), 25 Fed.Cas., p. 38, and *Brown* v. *Walker,* 161 U.S. 591 [16 S.Ct. 644, 40 L.Ed. 819], are cited. Then *People* v. *Forbes,* 143 N.Y. 219 [38 N.E. 303], is cited and this portion is quoted:

"They should be compelled to swear unequivocally that their testimony would incriminate them, and then the court should be satisfied that there is reasonable ground to appre-

hend danger to the witnesses from their being compelled to answer.''

Also, *In re Stewart,* 121 Wash. 429, 209 P. 849, 852, is cited as setting forth the modern rule as found in 28 R.C.L. 428, where it is said:

''There are several English authorities which hold that a witness is the sole judge of whether answering a certain question asked would tend to incriminate him. There are also American authorities which seem to lean to the same view. However, the great weight of authority is to the contrary, and it is now settled, both in England and in this country, that it is the province of the court to determine in the first instance under all the circumstances of the case whether any direct answer to a proposed question has a tendency to criminate a witness, and, of course, it is the duty of the court, while it protects the witness in the due exercise of his privilege, to take care that he does not, under the pretense of defending himself, screen others from justice, or withhold evidence which he might safely give. Otherwise it would be in the power of every witness to deprive parties of the benefit of his testimony, by a merely colorable pretense that his answers to questions would have a tendency to implicate him in some crime or misdemeanor, or would expose him to a penalty or forfeiture, *when it is clear that the questions have no such tendency.''*

Summarizing the cases therein discussed, the court held: ''. . . that the court is first charged with the responsibility of determining whether there is a *real danger.''* (Italics ours.)

Measured in the light of these general rules, can it be said that all of the questions propounded to the witness entitled him to swear to and rightfully claim the immunity, i. e., that the answers thereto would tend to or would criminate him, and that the trial court was justified in holding that there was a *real danger* that they would?

It seems doubtful to us that Father Galvin ever intended that such interpretation could be placed upon his refusal to answer the questions propounded, that is, first, the inference that he had in fact violated section 154 of the Penal Code and fraudulently sold or concealed his property with intent to defraud his creditors; second, being under oath to tell the truth, that he intended to swear that if he gave answer to the questions propounded, his answers would in fact criminate

him or tend to criminate him and furnish evidence of the fact that he had so violated that section. To entitle him to that protection it must be so inferred, and that he wished to claim his privilege for that reason.

Since the witness and his counsel wish to insist upon exercising this privilege, it will be necessary for us to analyze some of the questions propounded, separately, and in the light of the general rule above mentioned. The first question: "Q. Father Galvin, are you employed by anyone at the present time?" Under no argument presented do we see any *real danger* that this question to which the court sustained an objection, might criminate him or tend to criminate him. The ruling, therefore, was erroneous. Second: "Q. Father Galvin, do you have a safe deposit box in any bank or trust company?" We likewise see no merit to the form of objection made to this preliminary question. An affirmative or negative answer to it would not tend to criminate the witness. Third: "Q. Do you own any U. S. War Bonds, Father?" The plaintiff should have answered the question. Likewise, an affirmative or negative answer to this preliminary question could not be reasonably construed as constituting a *real danger* that thereby the witness tended to or did criminate himself. Fourth: "Q. Does anyone owe you money at the present time?" We do not see how an affirmative answer to this question would criminate the witness. Section 154 of the Penal Code describes the offense as the fraudulent sale, assigning or concealing of the debtor's property. If some creditor owes defendant money at the present time, it cannot reasonably be held from that fact alone that any property of the judgment debtor has been fraudulenty sold, assigned or concealed. The question seems quite proper and harmless.

The same conclusion should be reached as to whether he, at the present time, owns life insurance or real estate or money. We see nothing in these preliminary questions that would show that defendant had had money, real estate or life insurance and had later fraudulently concealed it, with intent to defraud creditors.

Viewing the record of the examination of the witness and the few preliminary questions propounded, we are not prepared to hold that the trial judge was justified in determining that there was a *real danger* that if the defendant was

compelled to answer these specified questions as propounded, that he would thereby tend to or would in fact incriminate himself.

The order is reversed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied March 26, 1947, and respondent's petition for a hearing by the Supreme Court was denied April 24, 1947.