[No. B146651. Second Dist., Div. One. Feb. 1, 2002.]

In re the Marriage of GAIL B. and JEFFREY L. SACHS.
GAIL B. SACHS, Appellant, v.
JEFFREY L. SACHS, Respondent.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part D. in the Discussion.

†Pursuant to California Constitution, article VI, section 21.

**COUNSEL**

Law Offices of David B. Bloom and Ted L. Travis for Appellant.

Buter, Buzard & Dunaetz, Irwin Buter and Andrew W. Bodeau for Respondent.

**OPINION**

**MALLANO, J.**—This family law case raises the question of whether a parent who fails to make court-ordered support payments can successfully invoke the Fifth Amendment privilege against self-incrimination in response to questions about personal income at a judgment debtor examination.

We conclude that, in the circumstances of this case, the father cannot rely on his failure to pay support as a justification for his subsequent refusal to provide financial information that could be utilized to collect his arrearages. To hold otherwise would allow him to take advantage of his own wrong.

I

BACKGROUND

In November 1959, Gail and Jeffrey Sachs were married. They had three children. On April 7, 1977, the marriage was dissolved by way of "Findings and Judgment" entered in the Supreme Court of the State of New York for the County of Westchester.[1]

Jeffrey was ordered to pay Gail spousal support of $1,950 per month and child support of $216.66 per month for each child. Upon the sale of the

---

[1] The "Findings and Judgment" incorporated by reference an "Agreement of Separation" executed by the parties on March 25, 1977. For simplicity, we will refer to both documents as the "Findings and Judgment."

family residence, the child support payments increased to $541.66 per month for each child. Jeffrey was also responsible for paying the educational expenses of each child up to the age of 25, including private elementary and secondary schools, undergraduate college, graduate school, and professional school. In addition, Jeffrey was to pay all medical and dental costs of the children until they became emancipated.

On June 24, 1991, the Findings and Judgment were modified by a stipulation between the parties entered in the Superior Court of the State of Connecticut for the Judicial District of Stamford/Norwalk. The stipulation reflected that, as of June 24, 1991, Jeffrey was $96,427 in arrears on child support, spousal support, and the children's educational and medical expenses. The stipulation required Jeffrey to extinguish the arrearages over time, to make payments for certain educational expenses, and, except as otherwise provided, to continue making payments in accordance with the Findings and Judgment of the New York court.

At some point, Jeffrey moved to California. On April 8, 1994, Gail served Jeffrey in California with an "Order to Show Cause and Declaration for Contempt." Apparently, she did not pursue the matter.

On January 19, 1996, Gail registered the modified Findings and Judgment in the State of California, filing a statement for registration of foreign support order in the trial court. The statement indicated that the amount of unpaid support, as of December 31, 1995, was $244,467.62, consisting of $182,425 in principal and $62,042.62 in interest. The statement further disclosed that Jeffrey was a resident of California and Gail resided in New York.[2]

Meanwhile, on May 21, 1977, Jeffrey married his second wife, Sally. They had two children. Their marriage was dissolved by way of a judgment entered on June 20, 1988, in the Superior Court of the State of Connecticut for the Judicial District of Stamford/Norwalk. The judgment mandated child and spousal support. As of December 1, 1994, unpaid support totaled $35,000, plus interest. On January 13, 1995, Sally registered the judgment in California (*Sachs v. Sachs* (Super. Ct. L.A. County, 1995, No. BL020459)). At the time, Sally lived in Canada and Jeffrey lived in California.

In 1992, Jeffrey married his third wife, Karen. Five years later, they separated. Eventually, their marriage was dissolved.

---

[2] As provided in the California Family Code: "A support order or an income-withholding order issued by a tribunal of another state may be registered in this state for enforcement." (Fam. Code, § 4950.) "A support order or income-withholding order issued in another state is registered when the order is filed in the registering tribunal of this state. [¶] . . . A registered order issued in another state is enforceable in the same manner and is subject to the same procedures as an order issued by a tribunal of this state." (*Id.*, § 4952, subds. (a), (b).)

In 1996, after filing the statement of registration of foreign support order in California, Gail garnished Jeffrey's wages. In July 1998, she obtained a writ of execution and levied on Jeffrey's bank account. In August 1998, she levied on Karen's bank accounts.

On August 13, 1998, Gail filed and subsequently served Karen with an "Application and Order for Appearance and Examination" and a subpoena duces tecum, setting the examination for October 14, 1998. Karen appeared for the examination, answered the questions put to her, and produced the documents in her possession. She testified that, in 1993, after marrying Jeffrey, he "gifted" two companies to her. The companies operated out of the same office, which Jeffrey and Karen both occupied. While Karen owned the companies, she employed Jeffrey as an "independent contractor" and paid him $1,000 per week, making checks payable to his corporation, Sachs Enterprises, Inc. In 1997, the year that Jeffrey and Karen separated, she transferred the companies back to him, for which he paid $120,000.

On August 13, 1998, Gail obtained and thereafter served Jeffrey with an order to appear at a judgment debtor examination. She also served him with a subpoena duces tecum. On October 14, 1998, Jeffrey appeared for the examination but refused to answer the very first question and did not produce any documents, invoking the Fifth Amendment privilege against self-incrimination. Jeffrey claimed that the disclosure of information about his financial status might tend to incriminate him if Gail or Sally ever initiated contempt proceedings against him for failing to pay support.

Upon Jeffrey's refusal to answer questions, the parties sought a ruling from the trial court, which established a briefing schedule and set the matter for hearing. The parties filed points and authorities. On November 30, 1998, the trial court heard argument and ruled that, although the Fifth Amendment applies to judgment debtor examinations, Jeffrey could not assert a blanket objection to the examination but had to assert the privilege on a question-by-question basis. The trial court continued the examination to February 1, 1999. Gail subsequently took it off calendar.[3]

On May 26, 2000, Gail obtained and thereafter served Jeffrey with a second order to appear at a judgment debtor examination. She also served

---

[3]Jeffrey contends that, at the November 30, 1998 hearing, the trial court sustained his objections to the examination and ruled that he did not have to answer any questions. But the record contains no court order to that effect. Further, Gail's trial attorney indicated in a declaration that there was no such ruling. And Jeffrey has acknowledged that the trial court rescheduled the examination for February 1, 1999. A postponement would not have been necessary if Jeffrey's blanket objection had been sustained.

him with a subpoena duces tecum.[4] The examination took place on two days, July 10 and July 26, 2000. Gail's counsel asked a lengthy series of questions, and Jeffrey invoked the Fifth Amendment as to each question he thought objectionable. He also refused to produce any documents.

On August 29, 2000, Gail filed a motion to compel Jeffrey to answer questions and produce documents at the judgment debtor examination. Gail agreed not to pursue contempt charges if the trial court overruled Jeffrey's Fifth Amendment objections and compelled him to provide information.

Jeffrey filed opposition to the motion. At the trial court's request, the parties filed supplemental papers on the question of whether Jeffrey was subject to contempt proceedings in New York, Connecticut, and California. By order dated November 1, 2000, the trial court denied Gail's motion to compel and sustained Jeffrey's objections. Gail filed a timely appeal.

## II

### DISCUSSION

In this case, we must balance competing interests: Jeffrey's interest in avoiding self-incrimination and Gail's interest in the disclosure of information that could enable her to collect the support that Jeffrey owes her and the children. We begin our analysis with a general discussion about the privilege against self-incrimination. We then discuss the application of the privilege in the context of contempt proceedings. Finally, we balance the parties' respective interests.

### A. *The Privilege Against Self-incrimination*

The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." The same right is guaranteed under the California Constitution (Cal. Const., art. I, § 15) and by state statute (Evid. Code, § 940).

██ "The privilege against self-incrimination applies in judgment debtor proceedings." (*Troy v. Superior Court* (1986) 186 Cal.App.3d 1006, 1010 [231 Cal.Rptr. 108].) "But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. . . . To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a

---

[4]A judgment debtor may be examined once every four months. (Code Civ. Proc., § 708.110.)

responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (*Hoffman v. United States* (1951) 341 U.S. 479, 486-487 [71 S.Ct. 814, 818, 95 L.Ed. 1118]; accord, *Blackburn v. Superior Court* (1993) 21 Cal.App.4th 414, 427 [27 Cal.Rptr.2d 204].)

■ "The trial judge in appraising the claim [of privilege] 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' . . ." (*Hoffman v. United States, supra,* 341 U.S. at p. 487 [71 S.Ct. at p. 818].) On appeal, we review the trial court's ruling for an abuse of discretion. (*Troy v. Superior Court, supra,* 186 Cal.App.3d at p. 1011.)

"To invoke the privilege, a witness need not be guilty of any offense; rather, the privilege is properly invoked whenever the witness's answers 'would furnish a link in the chain of evidence needed to prosecute' the witness for a criminal offense. . . . [A] trial court may compel the witness to answer only if it 'clearly appears to the court' that the proposed testimony 'cannot possibly have a tendency to incriminate the person claiming the privilege.' " (*People v. Cudjo* (1993) 6 Cal.4th 585, 617 [25 Cal.Rptr.2d 390, 863 P.2d 635].) "The privilege 'can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory . . . .' " (*Segretti v. State Bar* (1976) 15 Cal.3d 878, 886 [126 Cal.Rptr. 793, 544 P.2d 929].)

" 'A party is not entitled to decide for himself whether he is protected by the fifth amendment privilege. . . . [T]his question is for the court to decide after conducting "a particularized inquiry, deciding, in connection with each specific area that the questioning party seeks to explore, whether or not the privilege is well-founded." . . .' . . .

". . . [A] blanket refusal to testify is unacceptable; a person claiming the Fifth Amendment privilege must do so with specific reference to particular questions asked or other evidence sought. . . . [O]nce this is done, the trial court must undertake a particularized inquiry with respect to each specific claim of privilege to determine whether the claimant has . . . establish[ed] that the testimony or other evidence sought might tend to incriminate him." (*Warford v. Medeiros* (1984) 160 Cal.App.3d 1035, 1045 [207 Cal.Rptr. 94], citations and italics omitted; accord, *Fisher v. Gibson* (2001) 90 Cal.App.4th 275, 286 [109 Cal.Rptr.2d 145].)[5] "[T]he burden is on the party or witness [invoking the privilege] to show that the testimony or other evidence could

---

[5] Of course, at a judgment debtor examination, it may take only a few unanswered questions at the start to realize that the claimant is not going to provide any information. In that event,

tend to incriminate him or her." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2001) ¶ 8:139, p. 8C-24.2; accord, *Warford v. Medeiros, supra,* 160 Cal.App.3d at p. 1045; Evid. Code, § 404.)

## B. *Contempt for Failure to Pay Support*

 Jeffrey argues that the testimony and documents sought at the judgment debtor examination could provide evidence tending to incriminate him on contempt charges arising out of his alleged failure to comply with the support orders entered in New York, Connecticut, and California. Jeffrey believes that he may remain silent about his financial affairs so as to avoid a finding of contempt. Yet, in contempt proceedings, Jeffrey would be found guilty *if he remained silent.* That is the law in all three states.

As a preliminary matter, we do not know the exact amount of Jeffrey's arrearages. After Gail filed the January 19, 1996 statement for registration of foreign support order—which indicated arrearages of $244,467.62—she levied on the bank accounts of Jeffrey and Karen and garnished Jeffrey's wages, receiving amounts that have not been identified. In her motion to compel, Gail stated that the arrearages exceeded $300,000.

Nor do we know the breakdown of the arrearages by category, namely, child support, spousal support, educational expenses, and medical costs, respectively. While the parties' 1991 stipulation used those four categories to describe Jeffrey's arrearages, the present proceedings are based on an undifferentiated sum. For purposes of discussion, we will assume that the arrearages include both child and spousal support.

### 1. *Contempt Under California Law*

 In *Moss v. Superior Court* (1998) 17 Cal.4th 396 [71 Cal.Rptr.2d 215, 950 P.2d 59] (*Moss*), our Supreme Court held that the "[a]bility to comply with a support order is not an element of the contempt which must be proven beyond a reasonable doubt by the petitioner. Inability to comply is an affirmative defense which must be proven by a preponderance of the evidence by the alleged contemner." (*Id.* at p. 425.) "[A]bility to pay has traditionally been considered an affirmative defense in contempt proceedings." (*Id.* at p. 426.) "[T]he elements of . . . contempt are only a valid court order, the alleged contemner's knowledge of the order, and noncompliance.

it would be pointless to go on. " 'Where . . . it is apparent that the witness would have offered no testimony in response to questions posed, it is not improper for the trial court to determine that fact in advance and excuse the witness.' " (*People v. Fonseca* (1995) 36 Cal.App.4th 631, 638 [42 Cal.Rptr.2d 525].)

If the petitioner proves those elements beyond a reasonable doubt the violation is established. He or she need go no farther. To prevail on the affirmative defense of inability to comply with the support order, the contemner must prove such inability by a preponderance of the evidence." (*Id.* at p. 428.)

This is so for two reasons, as explained in *Moss*, *supra*, 17 Cal.4th 396. First, "[t]he ability of the parent to pay the amount of support ordered has [already] been determined by the court that made the order." (*Id.* at p. 428.)

Second, like the rule of convenience applicable to many defenses, " '[t]he contemner is the person in the best position to know whether inability to pay is even a consideration in the proceeding and also has the best access to evidence on the issue, particularly in cases of self-employment. Considerations of policy and convenience have led courts to sanction placement of the burden of establishing a defense on defendants under similar circumstances . . . .' " (*Moss*, *supra*, 17 Cal.4th at p. 427.) "Common sense dictates that the contemner raise inability to pay." (*In re Feiock* (1989) 215 Cal.App.3d 141, 146 [263 Cal.Rptr. 437], overruled on another point in *Moss*, *supra*, 17 Cal.4th at p. 428.)

With regard to child support in California, section 1209.5 of the Code of Civil Procedure provides: "When a court of competent jurisdiction makes an order compelling a parent to furnish support or necessary food, clothing, shelter, medical attendance, or other remedial care for his or her child, proof that the order was made, filed, and served on the parent or proof that the parent was present in court at the time the order was pronounced and proof that the parent did not comply with the order is prima facie evidence of a contempt of court." (Hereafter section 1209.5.)

Section 1209.5, as construed by the courts, means: " '[P]roof of the [existence of the support] order, knowledge of it, and noncompliance "shall be prima facie evidence of a contempt of court." . . . In other words, proof of these basic facts *proves the entire contempt*. Once the contempt is proved any excuse or justification, such as ability to pay, is a matter of defense. . . .' " (*Moss*, *supra*, 17 Cal.4th at p. 427, italics added.)

Although section 1209.5 governs *child* support orders, California law with respect to spousal support is the same. Over 90 years ago, in *In re McCarty* (1908) 154 Cal. 534 [98 P. 540] (*McCarty*), the Supreme Court stated: "It is not necessary for a wife on the hearing of a contempt proceeding for nonpayment of alimony to prove anything more than the making of the order and disobedience of it by her husband in refusing to pay the amounts which

the court found he had the ability to do when it made the order. She makes a *prima facie* case at the hearing by producing the original order, and by proof of the refusal of her husband to make payment according to its terms . . . . [I]f [the husband's] excuse is that since the making of the original order he has become unable to pay the alimony required by it, it is incumbent upon him to prove that fact." (*Id.* at p. 537.)

Just two years ago, in *Moss, supra,* 17 Cal.4th 396, the high court cited *McCarty* with approval for the proposition that " '[f]or many years in California ability to pay has been considered, without much analysis, to be a matter of defense in contempt proceedings. . . . [¶] This approach is consistent with [the] legislative intent [of section 1209.5], constitutional law, and common sense. . . .' " (*Moss, supra,* 17 Cal.4th at p. 426.)

And as more recently stated by Division Five of this court: "It may be argued that . . . section 1209.5 expressly refers only to child support orders and therefore ability to pay must be an element of other similar family law orders. We are not persuaded by this argument. . . . Nothing suggests that the intent of the Legislature in enacting . . . section 1209.5 was to abrogate the general case authority holding that ability to pay is not an element of contempt of family law orders in which ability to pay has already been determined. . . . [T]he holding of *McCarty* was supported by the broad language of *Moss*[, *supra,* 17 Cal.4th 396,] relegating inability to pay in family law contempt proceedings to an affirmative defense." (*In re Ivey* (2000) 85 Cal.App.4th 793, 801-802 [102 Cal.Rptr.2d 447], fn. omitted.)[6]

Finally, we note that a spouse who is experiencing financial difficulty in making support payments can avoid the possibility of contempt by filing an application to reduce support and demonstrating a material change in circumstances. (See Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2001) ¶¶ 17:25 to 17:64.5, 17:135 to 17:232, 17:360 to 17:410, pp. 17-8 to 17-17, 17-32.3 to 17-56.1, 17-82 to 17-90.2.)

2. *Contempt Under New York Law*

In New York, "[a] prima facie case of willful violation [of a support order] [is] established by the proof that the father ha[s] not paid court

---

[6]In *Mery v. Superior Court* (1937) 9 Cal.2d 379 [70 P.2d 932], the court stated that the inability to pay *spousal* support was not an affirmative defense to be proved by the alleged contemner but was an element of contempt to be proved by the petitioner where the alleged contempt had occurred 10 years after the issuance of the underlying support order. (*Id.* at p. 380.) *Mery*'s exception to the general rule is of no concern here. Jeffrey does not rely on it or even mention it. The issue is therefore waived. (See *Interinsurance Exchange v. Collins* (1994) 30 Cal.App.4th 1445, 1448 [37 Cal.Rptr.2d 126].)

ordered child support . . . . At that point, the burden of proving inability to pay shift[s] to the father . . . ." (*Ahrem v. Cattell* (1998) 254 A.D.2d 352 [678 N.Y.S.2d 296]; accord, *Fallon v. Fallon* (2001) 286 A.D.2d 389 [728 N.Y.S.2d 725]; see N.Y. Fam. Ct. Act § 454(3)(a).) Similarly, a failure to pay spousal support requires the supporting spouse to prove inability to pay. (*Rosenberg v. Rosenberg* (1963) 19 A.D.2d 873 [244 N.Y.S.2d 117]; see N.Y. Jud. Law § 770 (McKinney 1992).)

Under New York law, "[a] respondent is prima facie presumed . . . to have sufficient means to support his or her spouse and children under the age of 21 . . . . [M]oreover, failure to pay support as ordered itself constitutes 'prima facie evidence of a willful violation' . . . . Thus, proof that respondent has failed to pay support as ordered alone establishes petitioner's direct case of willful violation, shifting to respondent the burden of going forward . . . ." (*Powers v. Powers* (1995) 86 N.Y.2d 63, 68-70 [629 N.Y.S.2d 984, 653 N.E.2d 1154, 1157].)

### 3. *Contempt Under Connecticut Law*

The same rules apply in Connecticut. "[T]he inability to comply [with a support order] is a good defense to a claim of contempt. . . . The contemnor must establish that he cannot comply, or was unable to do so." (*Bunche v. Bunche* (1994) 36 Conn.App. 322, 325-326 [650 A.2d 917, 919], citation omitted.) "Once the existence of a payment order and the absence of payments has been proved, the lack of any basis or explanation for nonpayment reasonably allows the conclusion that the contemnor has the ability to comply with the order. [¶] However, once non-compliance with an existing order has been proved, the burden shifts to the responding party to prove that his or her non-compliance was not willful." (8 Rutkin et al., Connecticut Practice Series: Family Law and Practice (2d ed. 2000) § 34.12, p. 117, fn. omitted; accord, *Eldridge v. Eldridge* (1998) 244 Conn. 523, 529-532 [710 A.2d 757, 761-762]; *Bryant v. Bryant* (1994) 228 Conn. 630, 637 [637 A.2d 1111, 1115].)

In sum, at a contempt proceeding in New York, Connecticut, or California, Jeffrey's silence about his income would be his undoing.

### C. *The Parties' Conflicting Interests*

"[A] civil defendant does not have the absolute right to invoke the privilege against self-incrimination. . . . A party or witness in a civil proceeding 'may be required either to waive the privilege or accept the civil consequences of silence if he or she does exercise it. . . .' . . . Courts

recognize the dilemma faced by a defendant who must choose between defending the civil litigation by providing testimony that may be incriminating on the one hand, and losing the case by asserting the constitutional right and remaining silent, on the other hand. . . .

"At the same time, courts must also consider the interests of the plaintiff in civil litigation where the defendant is exposed to parallel criminal prosecution. . . . ' " '[T]he fact that a man is indicted cannot give him a blank check to block all civil litigation on the same or related underlying subject matter. Justice is meted out in both civil and criminal litigation . . . .' . . . " ' . . .

"Added to the mix, of course, is the interest of the courts in fairly and expeditiously disposing of civil cases, and in efficiently utilizing judicial resources. . . . [C]ourts are guided by the strong principle that any elapsed time other than that reasonably required for pleadings and discovery 'is unacceptable and should be eliminated.' . . . Courts must control the pace of litigation, reduce delay, and maintain a current docket so as to enable the just, expeditious, and efficient resolution of cases. . . . [¶] . . . [¶]

". . . Courts that are confronted with a civil defendant who is exposed to criminal prosecution arising from the same facts 'weigh the parties' competing interests with a view toward accommodating the interests of both parties, if possible.' . . . Courts have broad discretion in controlling the course of discovery. . . . Hence, in a discovery dispute [involving the privilege against self-incrimination] . . . , the trial court must exercise its discretion in assessing and balancing 'the nature and substantiality of the injustices claimed' on all sides." (*Fuller v. Superior Court* (2001) 87 Cal.App.4th 299, 305-307 [104 Cal.Rptr.2d 525], citations omitted.)

"Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one. Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly." (*California v. Byers* (1971) 402 U.S. 424, 427 [91 S.Ct. 1535, 1537, 29 L.Ed.2d 9] (plur. opn. of Burger, C. J.); accord, *People v. Coleman* (1975) 13 Cal.3d 867, 885 [120 Cal.Rptr. 384, 533 P.2d 1024].)

"A party may claim the Fifth Amendment privilege against self-incrimination where to disclose financial information might lead to prosecution

under [certain] statutes. This issue frequently arises in divorce cases, either in the context of initial financial determinations incident to the divorce or in subsequent proceedings such as proceedings to modify alimony or child support orders.

"The successful invocation of the privilege against self-incrimination by a party, however, may present insurmountable obstacles to litigation of matrimonial disputes. That is, if a party asserts the privilege and succeeds in excluding tax returns and other financial information, the court's ability to assess the relative financial positions of the parties and make appropriate property and support provisions in a marital dispute may be severely undermined.

"Thus, courts have struggled to find ways to preserve both the claimant's constitutional privilege and the integrity of the trial process." (Feldman & Reed, *Silences in the Storm: Testimonial Privileges in Matrimonial Disputes* (1987) 21 Fam. L.Q. 189, 228-229, fn. omitted.)

For example, in a New York case involving spousal support, the trial court ordered the husband to answer questions about information contained in his tax return. In response, he invoked the Fifth Amendment. The trial court described the parties' competing interests, explaining:

"In the judicial determination of whether silence is indeed justified, each case must be controlled by its own facts . . . .

"In this, as in all difficult matrimonial disputes, the wife has a right to inquire into the financial status of her husband. While it is quite true that the husband has an absolute Constitutional right to assert the privilege against self-incrimination, his declaration of said assertion does not preclude any further inquiry. The difficulties that arise in these touchy matters are obvious; that is, if further inquiry were permitted to be pursued, the very matter that the Constitution seeks to protect would be divulged. Conversely, if the bald assertion of the privilege were accepted at face value, the substantive rights of the wife in this instance could be severely prejudiced. On balance, it would appear that the interests of justice would best be served if this examination were permitted to continue . . . under the close scrutiny and supervision of this court, toward the full protection of both the substantive rights of the wife and the Constitutional privileges of the husband." (*Slater v. Slater* (1974) 78 Misc.2d 13, 15-16 [355 N.Y.S.2d 943, 946], citation omitted.)

We, too, acknowledge the importance of both the Fifth Amendment and the obligation of a former spouse to make support payments.

██ The Fifth Amendment is fundamental to our system of criminal justice. "[It] is a right that was hard-earned by our forefathers. The reasons for its inclusion in the Constitution—and the necessities for its preservation—are to be found in the lessons of history. As early as 1650, remembrance of the horror of Star Chamber proceedings a decade before had firmly established the privilege in the common law of England. Transplanted to this country as part of our legal heritage, it soon made its way into various state constitutions and ultimately in 1791 into the federal Bill of Rights. The privilege, this Court has stated, 'was generally regarded then, as now, as a privilege of great value, . . . a safeguard against heedless, unfounded, or tyrannical prosecutions.' " (*Quinn v. United States* (1955) 349 U.S. 155, 161-162 [75 S.Ct. 668, 673, 99 L.Ed. 964, 51 A.L.R.2d 1157], fn. omitted.)

"[T]he American system of criminal prosecution is accusatorial, not inquisitorial, and . . . the Fifth Amendment privilege is its essential mainstay. . . . Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth." (*Malloy v. Hogan* (1964) 378 U.S. 1, 7-8 [84 S.Ct. 1489, 1493, 12 L.Ed.2d 653], citation omitted.)

██ At the same time, the importance of child support cannot be overstated. "Children are dependent on their parents for the necessities of life and it is essential to the public welfare that parents provide support with which to care for their needs." (*Moss, supra,* 17 Cal.4th at p. 422.)

As the statewide uniform guideline for determining child support indicates: (1) "[a] parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life"; (2) "[b]oth parents are mutually responsible for the support of their children"; (3) "[t]he guideline seeks to place the interests of children as the state's top priority"; (4) "[c]hildren should share in the standard of living of both parents"; and (5) "[c]hild support orders must ensure that children actually receive fair, timely, and sufficient support reflecting the state's high standard of living and high costs of raising children compared to other states." (Fam. Code, § 4053, subds. (a), (b), (e), (f) & (*l*); all further statutory references are to the Family Code unless designated otherwise.)

In balancing the parties' interests, we cannot help but point out that Jeffrey's argument is as counterintuitive as they come. Under his theory, a spouse ordered to pay child support could refuse to comply with the order at the outset. Having defied the order, the spouse could then invoke the Fifth Amendment in perpetuity, relying on the refusal to pay support as grounds for shielding his or her income from discovery.

Jeffrey also argues that, because he has refused to pay support for such a long period of time, resulting in substantial arrearages, his protection under the Fifth Amendment is all the more necessary. And he emphasizes that he is also in arrears with respect to his second wife, Sally, who can initiate contempt proceedings regardless of whether or not Gail does.

In short, as Jeffrey would have it, the higher the amount of arrearages and the greater the number of spouses and children entitled to support, the stronger the argument for applying the Fifth Amendment. Yet, common sense dictates that a spouse should not be able to take advantage of his or her own wrongdoing in this manner. (See Civ. Code, § 3517.) A spouse's refusal to pay support should not be rewarded with a lifetime of protection for his or her income.

" '[I]t is the duty of the court, while it protects the witness in the due exercise of the privilege, to take care that he does not, under the pretense of defending himself, screen others from justice . . . .' " (*Coleman v. Galvin* (1947) 78 Cal.App.2d 313, 321 [177 P.2d 606].) "Were we to accept [Jeffrey's] argument, . . . 'a defrauder who makes it big [could] always be cloaked and immune from a subsequent judgment debtor examination because there's always, quote, somebody out there who can come around and initiate a prosecution.' " (*Troy v. Superior Court, supra,* 186 Cal.App.3d at p. 1013.) Here, that somebody is Gail or Sally.

In *Young v. Keele* (1987) 188 Cal.App.3d 1090 [233 Cal.Rptr. 850], the parties engaged in settlement negotiations after a money judgment had been entered for the plaintiffs. They tentatively reached an accord, but the defendants reneged on the agreement. Later, during a judgment debtor examination, the individual defendant refused to answer questions about his sources of income, relying on Evidence Code sections 1152 and 1154. Those statutes generally preclude the admissibility of settlement offers and communications. The trial court overruled the objection, and the Court of Appeal affirmed, stating:

"[The defendant's] argument that the public policy consideration behind Evidence Code sections 1152 and 1154 precludes the questions in issue is illogical. These sections were enacted to encourage settlements in order to ease the court's heavy *trial* caseload. . . . [T]he [judgment debtor] examination is intended to be summary and factual, according the widest scope for inquiry concerning property and business affairs of the debtor; the object of the proceedings being to compel the judgment debtor to give information concerning his property. . . . Public policy does not support a judgment debtor's attempt to be less than candid about his [income] and ability to pay the judgment . . . [¶] . . . [¶]

"Judgment creditors make an interesting observation in their brief; they state that if [the defendant's] argument is accepted it would be a convenient format for a judgment debtor to engage in settlement negotiations before an examination and then decline to answer questions on the basis that they were related to the settlement negotiations. We agree." (*Young v. Keele, supra,* 188 Cal.App.3d at pp. 1093-1094.)

Like the judgment debtor in *Young,* Jeffrey is attempting to distort the law. Under his view, the Fifth Amendment would provide safe harbor for spouses seeking to thwart court-ordered support. " '[But] . . . the court . . . may prevent the mantle of protection from being turned into a cloak for fraud and trickery.' " (*Coleman v. Galvin, supra,* 78 Cal.App.2d at p. 320.)

Nevertheless, given that the Fifth Amendment applies to judgment debtor examinations (see *Hooser v. Superior Court* (2000) 84 Cal.App.4th 997, 1002-1003 [101 Cal.Rptr.2d 341]; *Troy v. Superior Court, supra,* 186 Cal.App.3d at p. 1010), Gail's right to support payments must accommodate Jeffrey's Fifth Amendment rights.

In the 1977 Findings and Judgment, which dissolved their marriage, Jeffrey and Gail agreed to "cooperate and confer with each other on all major matters pertaining to the Children's health, welfare, education, training and upbringing, in order to arrive at a mutual agreement on a harmonious policy calculated to promote the best interests of the Children." They also agreed that "[e]ach of the parties hereto, without cost to the other, shall at any time and from time to time hereafter execute and deliver any and all further instruments and assurances and perform any acts that the other party may reasonably request for the purpose of giving full force and effect to the provisions of this Agreement."

The purpose of those contractual terms is reflected in the provisions of the California Family Code. Section 3552 states: "In a proceeding involving child, family, or spousal support, no party to the proceeding may refuse to submit copies of the party's state and federal income tax returns to the court, whether individual or joint." (§ 3552, subd. (a).) Section 3552 also states: "The tax returns may be examined by the other party and are discoverable by the other party. A party also may be examined by the other party as to the contents of a tax return . . . ." (*Id.,* subd. (b).) And "[i]f the court finds that it is relevant to the case to retain the tax return, the tax return shall be sealed and maintained as a confidential record of the court." (*Id.,* subd. (c).)

Jeffrey would have us ignore the terms of the Findings and Judgment and declare section 3552 unconstitutional. We shall do neither.

In providing that a spouse can obtain the other spouse's income tax returns and "examine" the other spouse with respect to the contents of the returns, the Legislature—by enacting section 3552—has struck an appropriate balance between the conflicting interests of the supported spouse and the supporting spouse. Thus, the supported spouse can obtain information about the income of the supporting spouse, and the tax returns of the supporting spouse must remain confidential.

We therefore hold that Gail may conduct a judgment debtor examination (Code Civ. Proc., §§ 708.110-708.205) in conjunction with section 3552, that is, she may obtain a copy of Jeffrey's income tax returns and examine him about their contents, subject to the statutory requirement of confidentiality. (See Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶¶ 6:480 to 6:485, 6:886, pp. 6-194.5 to 6-194.6, 6-317 to 6-318 (rev. # 1, 2001) [discussing § 3552].)

Further, section 3552 is not the only provision in the Family Code that mandates the confidentiality of tax returns. Indeed, the Law Revision Commission comment to section 3552 includes a cross-reference to section 3665. (See Cal. Law Revision Com. com., 29D West's Ann. Fam. Code (1994 ed.) foll. § 3552, pp. 357-358.) Section 3665, in turn, expressly refers back to section 3552 (see § 3665, subd. (c)), and states in part that "[a] party shall not disclose the contents or provide copies of the other party's tax returns to anyone except the court, the party's attorney, the party's accountant, or other financial consultant assisting with matters relating to the proceeding, or any other person permitted by the court." (§ 3665, subd. (b).)

"The two statutes[, sections 3552 and 3665,] were clearly intended to function together as an integrated scheme, as is evidenced by the cross-references . . . ." (*Keh v. Walters* (1997) 55 Cal.App.4th 1522, 1535 [65 Cal.Rptr.2d 42].) In combination, those statutes ensure that Jeffrey's tax returns will be used only in the present proceeding and that information about his taxes will not be disclosed to third persons. And the trial court can take additional steps, if appropriate, to protect Jeffrey's and Gail's interests. (See, e.g., *Fuller v. Superior Court, supra*, 87 Cal.App.4th at p. 307 [trial courts can adopt "various procedural solutions designed to fairly balance the interests of the parties and the judicial system"]; Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶¶ 5:497 to 5:497.5, pp. 5-170 to 5-172 (rev. # 1, 2001) [discussing § 214].)[7]

In closing, we note that an individual must include in his or her income tax returns the income, if any, earned through criminal acts: "It would be an

---

[7]Jeffrey's reliance on *In re Leavitt* (1959) 174 Cal.App.2d 535 [345 P.2d 75] is of no avail. There, we upheld a spouse's assertion of the Fifth Amendment in a judgment debtor examination, but the statutory provisions upon which we rely today did not exist when

extreme if not an extravagant application of the Fifth Amendment to say that [the amendment] authorized a man to refuse to state the amount of his income because it had been made in crime." (*United States v. Sullivan* (1927) 274 U.S. 259, 263-264 [47 S.Ct. 607, 607, 71 L.Ed. 1037, 51 A.L.R. 1020]; accord, *Garner v. United States* (1976) 424 U.S. 648, 650, fn. 3 [96 S.Ct. 1178, 1180, 47 L.Ed.2d 370].) If an individual must disclose ill-gotten gains to the government, the Fifth Amendment notwithstanding, surely he or she can be required to provide a former spouse with income tax returns in a proceeding to collect support arrearages, at least where the information is compelled by statute and is subject to confidentiality safeguards set by the Legislature.[8]

### D. *Remaining Contentions**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### DISPOSITION

That portion of the order denying appellant's motion to compel responses to questions at the judgment debtor examination is reversed. That portion of the order denying appellant's motion to compel compliance with the subpoena duces tecum is affirmed. Appellant is entitled to costs on appeal.

Spencer, P. J., and Ortega, J., concurred.

A petition for a rehearing was denied February 25, 2002, and respondent's petition for review by the Supreme Court was denied May 15, 2002.

---

*Leavitt* was decided. (See Historical and Statutory Notes, 29D West's Ann. Fam. Code, *supra*, foll. § 3552, p. 358.) Nor is *Gonzales v. Superior Court* (1980) 117 Cal.App.3d 57 [178 Cal.Rptr. 358] of any relevance. In that case, the incriminating evidence could not be used against the defendants in any other proceeding because the trial court had issued a protective order in that respect.

[8]Although Gail initiated contempt proceedings against Jeffrey in 1994 (which she apparently did not pursue), she has agreed to waive future contempt charges if Jeffrey provides information at the judgment debtor examination. We express no view on whether we would reach the same result absent such a waiver.

*See footnote, *ante*, page 1144.